**AMERICAN BOOKSELLERS ASSOCIATION, INC., et al., Plaintiffs,**

v.

**James WEBB, et al., Defendants.**

**Civ. A. No. C84–697A.**

United States District Court, N.D. Georgia, Atlanta Division.

Sept. 26, 1986.

J. Kirk Quillian, William N. Withrow Jr., Troutman, Sanders, Lockerman & Ashmore, Atlanta, Ga., Michael A. Bamberger, Jeffrey A. Mitchell, Finley, Kumble, Wagner, Heine, Underberg & Casey, New York City, for plaintiffs.

Gibson Dean, II, Buford, Ga., for defendants Dodd, Crunkleton & Jenkins.

Michael Bowers, George Weaver, Atlanta, Ga., Jerry Gentry, Joseph C. Parker, Marietta, Ga., for defendants Webb, Stynchcombe, Chafin, Bowden, Rivers, Hutson, Hightower, Craft, Williams, Davis & Lowe.

George P. Dillard, Decatur, Ga., for defendants Jarvis & Burgess.

Marva Jones Brooks, Atlanta, Ga., for defendant Napper.

Thomas O. Davis, Decatur, Ga., Susan B. Forsling, Atlanta, Ga., Sam F. Little, Terry L. Miller, Dalton, Ga., Thomas O. Davis, Decatur, Ga., for defendant Matthews.

## ORDER

SHOOB, District Judge.

### I. *Introduction*

This case presents a conflict between one of society's most cherished rights—freedom of expression—and one of government's most profound obligations—the protection of minors. Seeking declaratory and injunctive relief, plaintiffs[1] challenge a Georgia statute, O.C.G.A. §§ 16–12–102—16–12–104 (the "Act"),[2] that, *inter alia,* makes it a criminal offense to sell to minors or to display in a place accessible to minors any material deemed "harmful to minors" under the Act. In contrast to Georgia's obscenity statute, O.C.G.A. § 16–12–80,[3] which defines obscenity based on

---

1. Plaintiffs are various associations of booksellers, publishers, periodical distributors, college stores, retailers, two bookstores, and an author. Defendants are various local solicitors, sheriffs, and police officers who have authority to enforce the challenged statute. The Attorney General of Georgia is not a named defendant, but he was served under O.C.G.A. § 9–4–7(c), and he was represented by George Weaver, who was appointed as a special assistant attorney general for this case and who acted as lead counsel at trial.

2. The relevant sections of the Act are set forth in the Appendix to this order. Amendments to the current law are indicated by striking through words deleted by the new Act and underlining words added by the new Act. Insignificant variations in punctuation and capitalization are not indicated.

3. Under O.C.G.A. § 16–12–80, which in large part tracks the standard enunciated in *Miller v.*

*California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), material is obscene if

(1) To the average person, applying contemporary community standards, taken as a whole, it predominantly appeals to the prurient interest, that is, a shameful or morbid interest in nudity, sex, or excretion;

(2) The material taken as a whole lacks serious literary, artistic, political, or scientific value; and

(3) The material depicts or describes, in a patently offensive way, sexual conduct specifically defined in subparagraphs (A) through (E) below:

(A) Acts of sexual intercourse, heterosexual or homosexual, normal or perverted, actual or simulated;

(B) Acts of masturbation;

(C) Acts involving excretory functions or lewd exhibition of the genitals;

(D) Acts of bestiality or the fondling of sex organs of animals; or

an adult's perception, the Act requires that material be assessed based on its appeal to minors; thus, it is clear that certain materials classified as harmful to minors would qualify as protected speech with respect to adults.

This variable standard of obscenity is not novel. Indeed, nearly twenty years ago, the United States Supreme Court held that a state may, without violating the First Amendment, employ a variable standard of obscenity to bar the sale of sexually explicit materials to minors.[4] Consequently, the Court finds no problem with the sale provision of the Act. Nevertheless, plaintiffs' attacks on the display provision and the statutory exception for libraries present vexing and unsettled questions.

The Supreme Court has yet to address directly the constitutionality of employing a variable obscenity standard to proscribe the display of otherwise protected materials. Although this Court is not writing on a clean slate, courts facing the issue have reached divergent conclusions.[5] There appears to be general agreement, however, on at least one point: in ruling on a constitutional challenge to a law designed to protect minors from certain forms of expression, a court must balance the extent to which the law serves the state's interest in safeguarding minors against the extent to which it infringes on the First Amendment rights of adults.[6]

Applying this analysis to the instant case, the Court concludes that the Act strays too far into the realm of protected speech to pass constitutional muster. At trial, plaintiffs introduced detailed evidence concerning the publishing and bookselling business. Based on this evidence, the Court is convinced that the Act imposes an unreasonable burden on the First Amendment rights of authors, publishers, booksellers, and adult readers. This is not to suggest that the First Amendment stands as a barrier to a carefully drafted and narrow display statute. See infra at 1556. But when a legislature deals in the sensitive area of protected speech, it must draft legislation with reasonable precision. The display provision at issue here goes well beyond the permissible boundaries of regulation, prohibiting the display not only of sexually graphic magazines and novels, but also of classic works of literature and a significant percentage of popular fiction. Thus, the Act would, in effect, reduce an adult's selection of reading materials to a book list suitable for a fifth-grade class. In addition, the statutory exception for libraries violates the Equal Protection Clause of the Fourteenth Amendment.

## II. Background and Findings of Fact

### A. Background

Governor Joe Frank Harris signed the Act on April 5, 1984; it was scheduled to

---

(E) Sexual acts of flagellation, torture, or other violence indicating a sadomasochistic sexual relationship;
(c) Additionally, any device designed or marketed as useful primarily for the stimulation of human genital organs is obscene material under this Code section.
(d) Material not otherwise obscene may be obscene under this Code section if the distribution thereof, the offer to do so, or the possession with the intent to do so is a commercial exploitation of erotica solely for the sake of their prurient appeal.

**4.** *Ginsberg v. New York,* 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968).

**5.** Several courts have held that display provisions similar to the Act are overbroad because they infringe on the First Amendment rights of adults. *American Booksellers Association v. Virginia,* 792 F.2d 1261 (4th Cir.1986), *aff'g,* 617

F.Supp. 699 (E.D.Va.1985); *Rushia v. Town of Ashburnham,* 582 F.Supp. 900 (D.Mass.1983); *American Booksellers Association v. McAuliffe,* 533 F.Supp. 50 (N.D.Ga.1981); *Tattered Cover, Inc. v. Tooley,* 696 P.2d 780 (Col.1985). Other courts have upheld such laws as valid time, place, and manner restrictions that impose only an incidental burden on protected speech. *Upper Midwest Booksellers v. City of Minneapolis,* 780 F.2d 1389 (8th Cir.1985), *aff'g,* 602 F.Supp. 1361 (D.Minn.1985); *M.S. News v. Casado,* 721 F.2d 1281 (10th Cir.1983); *American Booksellers Association v. Rendell,* 332 Pa.Super. 537, 481 A.2d 919 (1984). The United States Court of Appeals for the Eleventh Circuit has yet to consider the issue.

**6.** *See, e.g., Upper Midwest Booksellers v. City of Minneapolis,* 780 F.2d 1389, 1394-95 (8th Cir. 1985), *aff'g,* 602 F.Supp. 1361, 1373-74 (D.Minn. 1985); *Cruz v. Ferre,* 755 F.2d 1415, 1421 (11th Cir.1985).

take effect July 1, 1984. *See* O.C.G.A. § 1–3–4(a)(1) (governing the effective date of legislative acts). Plaintiffs filed suit on April 6, 1984, and moved for a preliminary injunction. After a brief discovery period, the Court consolidated a trial on the merits with a hearing on the motion for a preliminary injunction. In addition to the First Amendment and Equal Protection grounds considered in this order, plaintiffs' complaint challenged the Act based on the following state constitutional provision: "[n]o bill shall pass which refers to more than one subject matter or contains matter different from what is expressed in the title thereof." Ga. Const. Art. III, § V, ¶ III. Plaintiffs argued that the bill containing the Act, 1984 Ga.Laws 1495, violated this prohibition because it addressed both the prosecution of sexual offenses against children, O.C.G.A. §§ 16–6–4(b) and 16–6–5, and the sale and display of materials deemed harmful to minors. O.C.G.A. §§ 16–12–102—16–12–104.

At trial, defendants contended that, because the resolution of the state constitutional issue would render moot plaintiffs' federal constitutional claims, abstention was proper under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The Court agreed. By order dated June 27, 1984, the Court abstained from deciding the claims asserted by plaintiffs, stayed the case pending proceedings in the Georgia courts, and granted plaintiffs partial interim relief. 590 F.Supp. 677 (N.D.Ga.1984).

Plaintiffs appealed the June 27, 1984, order to the United States Court of Appeals for the Eleventh Circuit, which granted the parties' joint motion to present two certified questions to the Georgia Supreme Court. 744 F.2d 784 (11th Cir.1984). The first certified question inquired whether the Act violated the one subject matter provision of the Georgia constitution. The second requested a construction of the challenged portions of the Act. The Georgia Supreme Court answered the first question in the negative and declined to answer the second question. 254 Ga. 399, 329 S.E.2d 495 (1985). With this procedur-

al background in place, the Court will turn to the relevant facts.

## B. *Findings of Fact*

Plaintiffs' evidence at trial demonstrated that in-store display of books is the cornerstone of the industry's marketing practices. Relatively few books are advertised through the mass media, and, as a result, the vast majority of sales are impulsive selections prompted by a display. In the words of author Pat Conroy, "display unfortunately seems to be almost everything in modern day book publishing." Transcript of May 31, 1984, at 150. Similarly, bookstore owner Donald Arnold testified that a book is unlikely to sell many copies if it is not prominently displayed because

> [m]ost people are a little ... shy about asking for something. If they don't see it on display, usually they won't ask for it.

*Id.* at 136.

Although it is difficult to determine with certainty how many books fall within the Act, the Court finds that a significant percentage of an average bookstore's inventory would be barred from display. Bookstore owner Frank McGuire ("McGuire") stated that approximately 50% of the books he carried would be classified as harmful to minors under the Act. The Court does not question McGuire's sincerity, but his and similar estimates are based on overly broad readings of the Act. McGuire expressed concern that an "exercise magazine" featuring women clad in revealing bathing suits could be deemed harmful to minors. *See* Plaintiffs' Exhibit # 6. Though the Act is quite broad, its terms are limited to

> description[s] or representation[s] ... of nudity, sexual conduct, sexual excitement, or sadomasochistic abuse, [which]:
>
> (A) Taken as a whole, predominantly appeals to the prurient, shameful, or morbid interest of minors;
>
> (B) Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors; and

(C) Is, when taken as a whole, lacking in serious literary, artistic, political, or scientific value for minors.

O.C.G.A. § 16–12–102(1). Plainly, the type of magazine to which McGuire referred would not be covered by this definition.

Nonetheless, the Court does accept the opinion offered by Heather Florence, Vice-President, Secretary, and General Counsel of Bantam Books, Inc., viz., "that the predominant amount of all of the adult reading material, fiction and nonfiction, could arguably be encompassed within the terms of [the Act]." *Id.* at 87. Plaintiffs submitted several exhibits to support this view. *The White Hotel* by D.M. Thomas enjoyed critical acclaim and commercial success and holds obvious literary value for adults. *See* Plaintiffs' Exhibit # 11. Yet, under the Act, it could not be displayed because it contains several passages that graphically depict sexual encounters and because its literary value is beyond the comprehension of most minors. Accordingly, although a seventeen-year-old might appreciate the book's literary value, to the extent a ten-year-old could read and understand the book, it would appeal to his prurient interest.[7] Furthermore, the book does not meet the prevailing community standard with respect to what is suitable reading for most minors. For similar reasons, even classic works of literature, such as *Lady Chatterley's Lover* by D.H. Lawrence, would be barred from display. *See* Plaintiffs' Exhibit # 2.

Scientific texts would also fall prey to the display provision. For example, a textbook entitled *Human Sexuality* would, by virtue of its illustrations and frank treatment of sexual matters, appeal to the prurient interest of minors. *See* Plaintiff's Exhibit # 16. Simply stated, because display is the critical element in the marketing of books, and because the Act prohibits the display of a significant percentage of adult reading material, the Court finds that the Act would represent a major disruption in the business of bookselling and, as a practical matter, would drastically reduce adults' selection of reading material.

Further exacerbating the chilling effect of the display provision are the practical difficulties booksellers would face in complying with its terms. Approximately 500,000 books are in print at any given time, and 50,000 new books are published every year. Obviously, bookstore owners cannot hope to read more than a minimal percentage of the books they stock. Indeed, books are sold to retailers six to eight months before they are published. In rare instances, a retailer may have access to "galley proofs" before a book is printed in final form, but most books are purchased by retailers based on a synopsis provided by a publisher's catalogue. *See* Plaintiffs' Exhibit # 1. These terse descriptions do not give a retailer sufficient information to determine whether a book is covered by the Act; consequently, retailers would be unable to predict the percentage of their incoming inventory that could be displayed. Furthermore, inasmuch as a book that cannot be displayed is unlikely to prove successful, retailers would be hard pressed to determine how many copies to order of a given book. More likely than not, retailers, especially large retailers or nontraditional booksellers,[8] would err on the side of caution, refusing to order any book with a suggestive cover or the works of an author known for sexually explicit prose. One bookstore owner testified that, because it is impossible to review all incoming books, if forced to comply with the Act, he would remove from display the works of authors such as Sidney Sheldon, Jackie Collins, and Harold Robbins, based on their reputations as authors of adult material. The explanation for such drastic action is simple—book-

---

7. Bobbie Alford, a trained educator, offered a similar observation with regard to the play *Cat on a Hot Tin Roof* by Tennessee Williams.

8. At least with respect to popular paperback books, the vast majority of commercial outlets are nontraditional booksellers, including supermarkets, variety stores, airport shops, and newsstands.

store owners are unwilling to risk criminal prosecution.[9]

## III. Conclusions of Law

Plaintiffs contend, *inter alia*,[10] that the Act's display provision is overbroad under First Amendment standards and that the library exception provision violates the Equal Protection Clause of the Fourteenth Amendment. The Court will address these contentions in turn.[11]

### A. The Display Provision

The First Amendment, made applicable to the states by the Fourteenth Amendment, *Gitlow v. New York*, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925), allows content-based restrictions on speech "only in the most extraordinary circumstances." *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 65, 103 S.Ct. 2875, 2879, 77 L.Ed.2d 469 (1983); *see also City of Renton v. Playtime Theatres, Inc.*, — U.S. ——, 106 S.Ct. 925, 928, 89 L.Ed.2d 29

(1986); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 209, 95 S.Ct. 2268, 2272, 45 L.Ed.2d 125 (1975); *Police Department of Chicago v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). First Amendment protections do not apply to all forms of expression, however.

> There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene.... It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.

*Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942) (footnotes omitted).[12] Follow-

**9.** At trial, defendants argued that, under the current law barring sales of sexually explicit materials to minors, booksellers are already compelled to acquire knowledge of their stock; therefore, the argument goes, the new display provision does not impose any additional burden. In the Court's view, this argument was refuted by the testimony of bookseller Donald Arnold. When asked whether efforts to comply with the display provision would prove more taxing than those needed to comply with the sale provision, Arnold explained the practical differences between the demands of the two provisions. According to Arnold, a bookseller can more easily comply with the sale provision because at the point of sale he has the opportunity to assess the maturity of the purchaser and to review the book selected.

**10.** This order addresses only plaintiffs' challenges to the display and exemption provisions. As explained in the Court's order of June 27, 1984,

> the [Act] may be analyzed into five significant components: (1) the *definition* component, § 16–12–102, which defines the kind of materials that are deemed 'harmful to minors' and are subject to the proscriptions set forth in the following sections; (2) the *distribution* component, § 16–12–103(a), which prohibits any person from selling or otherwise furnishing to a minor any material that is harmful to minors; (3) the *exhibition* component, § 16–12–103(b), which prohibits any person from

exhibiting to a minor any motion picture, show, or other presentation that is harmful to minors; (4) the *display* component, § 16–12–103(e), which prohibits the display in public places where minors may be present of material that is harmful to minors; and (5) the *exemption* component, § 16–12–104, which exempts certain libraries from coverage under the Act.

590 F.Supp. at 687 (footnote omitted). Plaintiffs have challenged each of the components set forth above, but, for the reasons stated in the June 27, 1984, order, *id.* at 687–92, the Court rejects plaintiffs' contentions with respect to the definition, distribution, and exhibition components of the Act. Plaintiffs also attack the display component on vagueness grounds, but the Court need not reach this issue because it concludes that the provision is substantially overbroad.

**11.** The Court has previously determined that plaintiffs have standing to maintain this action and that a "case or controversy" exists within the meaning of Article III of the United States Constitution. 590 F.Supp. at 681 n. 1.

**12.** In *Chaplinsky*, the Supreme Court declared "fighting words" to be beyond the scope of the First Amendment. Other classifications of expression are denied constitutional protection "because it may be appropriately generalized that within the confines of the given classification, the evil to be restricted so overwhemingly outweighs the expressive interests, if any, at

ing the rationale expressed in *Chaplinsky,* the Supreme Court held that the First Amendment does not shield obscenity from state regulation in *Roth v. United States,* 354 U.S. 476, 483–85, 77 S.Ct. 1304, 1308–09, 1 L.Ed.2d 1498 (1957). *See also Erznoznik,* 422 U.S. at 208, 95 S.Ct. at 2272; *Miller v. California,* 413 U.S. 15, 23, 93 S.Ct. 2607, 2614, 37 L.Ed.2d 419 (1973).

There are, of course, limits to a state's power to classify material as obscene. Under *Miller,* the concept of obscenity is "limited to works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as whole, do not have serious literary, artistic, political, or scientific value." *Id.* at 24, 93 S.Ct. at 2615. Even where material is obscene under this standard, the state's authority is not unfettered: an individual cannot be prosecuted for viewing obscenity within the privacy of his own home. *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).

The state has somewhat broader power to regulate expression if such regulation serves the state's well-established interest in the well-being of its youth. *New York v. Ferber,* 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982); *F.C.C. v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978); *Ginsberg v. New York,* 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968); *see Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944). *Ginsberg* is the seminal case in this context. There the Supreme Court upheld a New York criminal statute that prohibited the sale to minors of sexually explicit material.[13] Relying on the state's interest in the welfare of minors, the Supreme Court expressly approved the concept of "variable obscenity," which allows a state to "accord minors ... a more restricted right than that assured to adults to judge and determine for themselves what sex material they may read or see." 390 U.S. at 637, 88 S.Ct. at 1279.

Although *Ginsberg* is the proper starting point for discussion, it is not dispositive of the issues now before the Court. It must be remembered that the statute involved in *Ginsberg* did not implicate the First Amendment rights of adults, since it proscribed only the sale of sexually explicit materials to minors while leaving unimpaired adults' access to such material. Conversely, the Georgia Act directly affects access to materials that, although classified as harmful to minors, are protected speech as to adults. Thus, the Act draws into conflict the First Amendment rights of adults and the state's power to supervise the moral development of its youth.

When faced with similar conflicts, courts have employed a balancing test. *Upper Midwest Booksellers,* 780 F.2d at 1389, 1394–95 (8th Cir.1985), *aff'g,* 602 F.Supp. 1361 (D.Minn.1985) ("The question we must address is whether [Minneapolis] has struck an appropriate balance between its legitimate interest in the protection of its young and allowing adults access to material protected under the First Amendment"); *Cruz v. Ferre,* 755 F.2d 1415, 1421 (11th Cir.1985). At one end of the spectrum, statutes are constitutionally infirm if they confine an adult's selection of reading matter to materials suitable for minors.

stake, that no process of case-by-case adjudication is required." *See New York v. Ferber,* 458 U.S. 747, 763–64, 102 S.Ct. 3348, 3358, 73 L.Ed.2d 1113 (1982) (child pornography); *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (speech provoking immediate lawless activity).

**13.** The statute challenged in *Ginsberg* employed a modified version of the standard set forth in *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), and *Memoirs v. Massachusetts,* 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966). *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), rejected the *Memoirs* test, however, and enunciated the test quoted in the text of this order. *See supra* at 1552. In the instant case, the Act tracks the *Miller* standard. This case should not be distinguished from *Ginsberg* on these grounds, however; indeed, it seems logical that juvenile obscenity statutes must now employ the *Miller* test. *See Upper Midwest Booksellers v. City of Minneapolis,* 780 F.2d 1389, 1391 n. 4 (8th Cir.1985); *M.S. News Co. v. Casado,* 721 F.2d 1281, 1286 n. 4 (10th Cir.1983).

*Butler v. Michigan,* 352 U.S. 380, 77 S.Ct. 524, 1 L.Ed.2d 412 (1957); *see also Youngs Drug Products,* 463 U.S. at 65, 103 S.Ct. at 2879. Where, however, a statute designed to protect minors has only an incidental impact on protected speech, it may be upheld if it qualifies as a reasonable time, place, and manner restriction. *Pacifica Foundation,* 438 U.S. at 748–51, 98 S.Ct. at 3039–41.

Before deciding where in the spectrum the display provision falls, the Court must consider the standards controlling the facial challenge raised by plaintiffs. A statute is facially invalid under First Amendment analysis only if (1) it cannot easily be given a saving construction; and (2) it has a real and substantial chilling effect on protected speech. *Erznoznik,* 422 U.S. at 216, 95 S.Ct. at 2276. In addition, the Supreme Court has stressed that a statute regarding "conduct plus speech" should not be held unconstitutional unless its overbreadth is substantial when weighed against its valid applications. *Ferber,* 458 U.S. at 766–74, 102 S.Ct. at 3359–64; *Broadrick v. Oklahoma,* 413 U.S. 601, 613–15, 93 S.Ct. 2908, 2916–18, 37 L.Ed.2d 830 (1973); *Red Bluff Drive-In, Inc. v. Vance,* 648 F.2d 1020, 1030 (5th Cir.1981) [14]. At least two circuits have concluded that display statutes involve conduct plus speech, rather than "pure speech." *Upper Midwest Booksellers,* 780 F.2d at 1392; *M.S. News Co. v. Casado,* 721 F.2d 1281, 1289 (10th Cir.1983). In the Court's view, display is significantly closer to pure speech than the activities at issue in *Broadrick* (political campaigning) and *Ferber* (child pornography); nonetheless, the Court assumes *arguendo* that the "sub-stantial overbreadth" requirement applies to the instant case.

■ Judged under the foregoing standards, the display provision is unconstitutional because it unduly hampers an adult's access to protected expression. Under the Act, material cannot be displayed if it fails to pass the *Miller* standard as modified to apply to minors. As noted above, a significant percentage of adult reading would be barred from display pursuant to this standard, and books that cannot be displayed are unlikely to attract the attention of the public. Consequently, a bookseller, exercising sound business sense, might well decide not to carry such books; in fact, if display provisions of this type became widespread, publishers could be deterred from publishing books featuring sexually frank prose. The practical difficulties booksellers would face in complying with the display provision would also chill the exercise of First Amendment rights.[15] It is simply not feasible for a bookseller to acquire adequate knowledge of his entire inventory to determine which materials could be classified as harmful to minors. Rather than risk prosecution, many booksellers would remove from display any book arguably within the ambit of the Act.[16] In sum, the display provision's overbreadth far outweighs its valid applications.

Defendants assert that potential limiting constructions of the display provision eliminate any constitutional infirmity. The Court concludes, however, that a limiting construction is not readily available, for the provision suffers from too many flaws. Construing a statute narrowly is a proper

**14.** *See Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (decisions rendered by the former Fifth Circuit before October 3, 1981, are binding upon the courts of the Eleventh Circuit).

**15.** It is true that, because the display provision applies only to places "frequented by minors or where minors are or may be invited as part of the general public," O.C.G.A. § 16–12–103(e), a bookseller could comply with the Act by closing his doors to minors. In addition to the disquieting aspects of such a course, this option is not viable for a great many retail outlets. *See supra*

at n. 8. Moreover, many adults would be reluctant to enter an "adults only" bookstore.

**16.** Defendants maintain that the Act's scienter requirement diminishes any chilling effect. The Court disagrees for two reasons. First, knowledge is defined broadly under the Act. *See* O.C.G.A. § 16–12–102(2). Second, according to the bookstore owners' testimony, the chilling effect results, in large measure, from the threat of prosecution; the prospect of acquittal offers little comfort.

course, but a court may not, as defendants here have requested, redraft legislation. *Universal Amusement Co. v. Vance,* 587 F.2d 159, 172 (5th Cir.1978) (en banc), *aff'd per curiam,* 445 U.S. 308, 100 S.Ct. 1156, 63 L.Ed.2d 413 (1980); *American Booksellers Association v. McAuliffe,* 533 F.Supp. 50 (N.D.Ga.1981).

Moreover, the limiting constructions offered by defendants would not save the display provision as it is currently drafted. Defendants maintain that the provision should be read to exclude from coverage books displayed in an "adults only" section or books covered with blinder racks or adults only tags. There are several problems with these suggestions. First, there is nothing in the Act or its legislative history to suggest this type of construction.[17] Second, based on the testimony at trial, it appears that even the compliance methods suggested by defendants would produce a chilling effect.[18] In the Court's view, the chilling effect attendant to the compliance methods suggested by defendants might be acceptable if the display provision applied only to material on the fringe of protected expression. But, as developed above, it applies with full force to classic works that are well within the protection of the First Amendment. Furthermore, there is no way to predict which, if any, of the modifications offered by defendants the Georgia courts will accept. As has often been stated, "[b]ecause First Amendment freedom needs breathing space to survive," *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963), regulation in the area of free speech must be reasonably precise. Here, the Act fails to "guide [booksellers] in deciding what are the least

restrictive modifications in display methods which would be sufficient to satisfy the statute." *American Booksellers Association v. Virginia,* 792 F.2d 1261, 1266 (4th Cir.1986), *aff'g,* 617 F.Supp. 699 (E.D.Va. 1985). Therefore, the Court concludes that the display provision cannot be saved by limiting constructions.

Nor can it be upheld as a reasonable time, place, and manner restriction. To qualify as a reasonable time, place, and manner restriction, a statute must be narrowly drawn and satisfy three criteria: (1) it cannot be based on content or subject matter; (2) it must further a significant governmental interest; and (3) it must allow for alternate forums of expression. *Playtime Theatres,* 106 S.Ct. at 928–931; *Regan v. Time, Inc.,* 468 U.S. 641, 104 S.Ct. 3262, 3266–3267, 82 L.Ed.2d 487 (1984); *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3068–3069, 82 L.Ed.2d 221 (1984). The United States Supreme Court has labored to define the dictates of the first requirement. *Playtime Theatres,* 106 S.Ct. at 929–930; *Young v. American Mini Theatres,* 427 U.S. 50, 69–71, 96 S.Ct. 2440, 2452–2453, 49 L.Ed.2d 310 (1976); *see also id.* at 82, n. 6, 96 S.Ct. at 2458, n. 6 (Powell, J., concurring). Ruling on a First Amendment challenge to a zoning ordinance regulating the location of "adult theaters," the *Playtime Theatres* Court concluded that a restriction is content-neutral if it is concerned with the "secondary effects" of the speech at issue (e.g., the negative impact of adult theaters on a neighborhood's environment), rather than with eradicating a particular type of speech. *See also International Food &*

---

**17.** Similarly, defendants have not offered any support for the contention that under the Act materials can be displayed if they hold literary value for anyone under the age of eighteen. Such a provision would go a long way toward curing the Act's defects, however.

**18.** As the Fourth Circuit explained in *American Booksellers Association v. Virginia,* 792 F.2d 1261, 1266 (4th Cir.1986), *aff'g,* 617 F.Supp. 699 (E.D.Va.1985),

Forcing a bookseller to create a separate, monitored adults only section, requiring that

the materials be sealed, or taking the materials off display and keeping them "under the counter" unreasonably interferes with the booksellers' right to sell the restricted materials and ... adults' ability to buy them. Many adults, for a variety of reasons, would not enter a display area identified as "for adults only." Selling materials in sealed wrappers or from under the counter would unrealistically limit access by adults and would significantly interfere with the Booksellers' business practices.

*Beverage Systems v. City of Fort Lauderdale,* 794 F.2d 1520 (11th Cir.1986). Under *Playtime Theatres,* there must be some evidence in the record to substantiate a finding that the regulated speech produces negative secondary effects. 106 S.Ct. at 930–31.

For several reasons, the display provision fails to qualify as a reasonable time, place, and manner restriction. As a preliminary matter, that the provision applies to a significant percentage of adult reading material demonstrates that it is not narrowly drawn. Beyond that, the provision plainly imposes content-based restrictions. It is arguable that, in light of *Playtime Theatres* and *American Mini Theatres,* content-based display regulations can be enacted to combat the deleterious "secondary effect" sexually explicit materials may have on minors. If established, such an effect would undoubtedly constitute a significant governmental interest. In the instant case, however, defendants failed to submit any evidence suggesting that the limited contact a minor may have with materials displayed in a bookstore produces a negative effect.[19] Furthermore, the Act does not allow for reasonable alternative forums or methods of communication. In *Playtime Theatres* and *American Mini Theatres,* the challenged zoning ordinances controlled only the placement of adult theaters; in appropriately zoned areas, adult theaters were free to operate in any manner consistent with First Amendment protections. Here, the Act applies to all book retailers within Georgia, and, as discussed above, the methods of display left available in the wake of the Act do not adequately serve the interests of free speech.

### B. The Library Exception

■ Pursuant to O.C.G.A. § 16–12–104, "any public library operated by the state or any of its political subdivisions [or] ... library operated as part of any school, college, or university" is exempt from the provisions of the Act. Plaintiffs contend this classification violates the Equal Protection Clause. The Court agrees.

The critical step in Equal Protection analysis is determining the proper standard of review. The Tenth Circuit applied the rational basis test in upholding an exception to a display statute in *M.S. News Co.,* 721 F.2d at 1291–92. In *Upper Midwest Booksellers,* 602 F.Supp. at 1373–74, the court declined to follow *M.S. News Co.* and instead applied the strict scrutiny test in passing on the constitutionality of a statutory exception to a display provision. The Court concludes that the approach followed in *Upper Midwest Booksellers* is correct.

It has long been held that where a classification infringes on a fundamental right, such as freedom of speech, the strict scrutiny test is applicable. *Attorney General of New York v. Soto-Lopez,* —— U.S. ——, 106 S.Ct. 2317, 90 L.Ed.2d 899 (1986); *Shapiro v. Thompson,* 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969); *Salem Inn, Inc. v. Frank,* 522 F.2d 1045, 1049 (2d Cir.1975). Under strict scrutiny analysis, a classification is unconstitutional unless the state can show that it is necessary to pro-

**19.** In *Ginsberg v. New York,* 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), the Supreme Court required only that New York cite a rational basis for concluding that sexually explicit materials are harmful to minors. As discussed above, however, the First Amendment rights of adults were not implicated in *Ginsberg.* Nor were the constitutional rights of minors infringed by the statute at issue, since the concept of variable obscenity did not, in itself, violate minors' rights, and since the materials affected by the statute were not protected by the First Amendment as applied to minors. *See Roth v. United States,* 354 U.S. 476, 483–85, 77 S.Ct. 1304, 1308–09, 1 L.Ed.2d 1498 (1957). In contrast to the situation in *Ginsberg,* the First Amendment rights of adults are implicated here. Thus, the evidentiary standard followed in *City of Renton v. Playtime Theatres, Inc.,* —— U.S. ——, 106 S.Ct. 925, 930–31, 89 L.Ed.2d 29 (1986), is controlling. Furthermore, *Ginsberg* is distinguishable from the instant case. It is one thing to say that an unlimited right to purchase and view sexually explicit materials would be harmful to minors; it is quite another to suggest that the mere display of materials will prove damaging. The Court does not deny that the latter proposition is plausible, but it is incumbent upon the state to cite some factual support for its view if the Act is to be upheld as a reasonable time, place, and manner restriction.

mote a compelling governmental interest. *E.g., Shapiro*, 394 U.S. at 634, 89 S.Ct. at 1331. The only governmental interest asserted in this case is the state's interest in protecting minors from arguably harmful materials. Defendants have not suggested any way in which the library exception is necessary to serve this interest.[20] Accordingly, the library exception cannot stand.

The only remaining issue is the scope of the relief to which plaintiffs are entitled. Plaintiffs contend that, if any provision of the Act is unconstitutional, the entire Act must fall. The Georgia legislature has, however, created a general presumption of severability. O.C.G.A. § 1–1–3. In addition, although divining legislative intent is never an exact science, the Court has little trouble concluding that the legislature would desire to have the definition, distribution, and exhibition provisions of the Act severed from the unconstitutional display provision. The library exception presents a significantly closer question, however. Arguably, severing the library exception from the remainder of the Act would contravene the legislature's intention to exempt libraries from criminal liability. It is possible, however, that once the display provision is stricken libraries would face little practical risk of prosecution. The existing record fails to address this issue adequately. Now that the scope of the Court's ruling on the constitutional issues is clear, the parties will be better able to address the issue of severability.

IV. *Conclusion*

It is, of course, far from simple to strike an appropriate balance between the weighty interests implicated by the Act.

The Court is certain that the Act represents a good faith effort by the legislature to protect the youth of Georgia. The evil in the Act is not its purpose, but rather its breadth. In the Court's view, a display statute that applied only to materials inappropriate for minors approaching the age of majority might well survive a constitutional attack. Any protected speech that fell within the terms of such a statute would surely be at the fringe of First Amendment rights. Reasonable alternative means of display would also be necessary for any display statute. At trial, the Attorney General and a state legislator who sponsored the Act represented that it was aimed primarily at slick and graphic magazines. The Court has little doubt that, consistent with the demands of the First Amendment, it is possible to draft a statute that restricts to a reasonable extent the display of such magazines.[21] But it is not for the Court to construct such a statute. The Court has pointed out the Act's deficiencies and suggested ways in which those deficiencies can be corrected; the legislature must now decide which options to enact.

In sum, the Court DECLARES the display provision and the library exception unconstitutional. Plaintiffs are allowed twenty days from the date of this order in which to address the issue of severability. Defendants are allowed twenty days thereafter in which to respond. Until the severability issue is resolved, the Court's preliminary injunction shall remain in effect.[22]

APPENDIX

New Code sections 16–12–102 through 16–12–104 amend the current Georgia law as follows:

---

**20.** The only justification defendants offered for the library exception is that the legislature could rationally distinguish between commercial and noncommercial institutions. Defendants have not contended that this argument withstands strict scrutiny analysis, but instead argued that the rational basis test is controlling. Still, it is worth noting that the legislature apparently rejected the commercial/noncommercial distinction in amending the Act, as indicated in the Appendix to this order. *See* O.C.G.A. § 16–12–103(a) and (b).

**21.** In addition, it is worth noting that a great number of the magazines defendants claimed to be the target of the Act could probably be prohibited from sale, as well as display, under the *Miller* standard. *See, e.g.,* Defendants' Exhibits 9, 10, and 13.

**22.** The Court wishes to acknowledge the skill and professionalism with which counsel for both sides litigated this case.

16–12–102. As used in this part, the term:

(1) 'Harmful to minors' means that quality of ~~any~~ description or representation, in whatever form, of ~~sexually explicit~~ nudity, sexual conduct, sexual excitement, ~~bestiality,~~ or sadomasochistic abuse, when ~~taken as a whole~~ it:

(A) Taken as a whole, predominantly appeals to the prurient, shameful, or morbid interest of minors;

(B) Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors; and

(C) ~~Lacks~~ Is, when taken as a whole, lacking in serious literary, artistic, political, or scientific value for minors.

(2) 'Knowingly' means having a general knowledge of, or reason to know, or a belief or ground for belief which warrants further inspection or inquiry of both:

(A) The character and content of any material described in this part which is reasonably susceptible ~~of~~ to examination by the defendant; and

(B) The age of the minor; provided, however, that an honest mistake shall constitute an excuse from liability ~~under~~ in this part if the defendant made a reasonable, bona fide attempt to ascertain the true age of such minor.

(3) 'Minor' means a person ~~under the age of 16~~ less than 18 years of age.

(4) 'Sadomasochistic abuse' means actual or simulated flagellation or torture by or upon a person who is nude, ~~or~~ clad in undergarments, a mask or bizarre costume, or the condition of being fettered, bound, or otherwise physically restrained ~~on the part of~~ by one so clothed or nude.

(5) 'Sexual conduct' means actual or simulated acts of masturbation, homosexuality, ~~bestiality,~~ sexual intercourse, or physical contact in an act of apparent sexual stimulation or gratification with a person's clothed or unclothed genitals, pubic area, buttocks, or, if such ~~person~~ be a female, breasts.

(6) 'Sexual excitement' means the condition of human male or female genitals when in a state of sexual stimulation or arousal.

(7) 'Sexually explicit nudity' means ~~the showing of~~ a state of undress so as to expose the human male or female genitals, pubic area, or buttocks with less than a full opaque covering, or the showing of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple, or the depiction of covered or uncovered male genitals in a discernibly turgid state.

16–12–103. (a) It shall be unlawful for any person knowingly to sell or loan for monetary consideration or otherwise furnish or disseminate to a minor:

(1) ~~A~~ Any picture, photograph, drawing, sculpture, motion picture film, or similar visual representation or image of a person or portion of the human body which depicts sexually explicit nudity, sexual conduct, or sadomasochistic abuse and which, ~~taken as a whole,~~ is harmful to minors; or

(2) Any book, pamphlet, magazine, printed matter however reproduced, or sound recording which contains any matter enumerated in paragraph (1) of this ~~Code~~ subsection, or explicit and detailed verbal descriptions or narrative accounts of sexual excitement, sexual conduct, or sadomasochistic abuse and which, taken as a whole, is harmful to minors.

~~16–12–104.~~ (b) It shall be unlawful for any person knowingly ~~to exhibit for a monetary consideration to a person under the age of 18 or knowingly~~ to sell or furnish to ~~a person under the age of 18~~ a minor an admission ticket or pass or knowingly to admit a ~~person under the age of 18~~ minor ~~for a monetary consideration~~ to premises whereon there is exhibited a motion picture, show, or other presentation which, in whole or in part, depicts sexually explicit nudity, sexual conduct, or sadomasochistic abuse and which, ~~taken as a whole,~~ is harmful to minors or exhibit any such motion picture at any such premises which are not designed to prevent viewing from any

public way of such motion picture by minors not admitted to any such premises.

(c) It shall be unlawful for any minor falsely to represent to any person mentioned in subsection (a) or subsection (b) of this Code section or to his agent that such minor is 18 years of age or older with the intent to procure any material set forth in subsection (a) of this Code section or with the intent to procure such minor's admission to any motion picture, show, or other presentation, as set forth in subsection (b) of this Code section.

(d) It shall be unlawful for any person knowingly to make a false representation to any person mentioned in subsection (a) or subsection (b) of this Code section or to his agent that he is the parent or guardian of any minor or that any minor is 18 years of age or older with the intent to procure any material set forth in subsection (a) of this Code section or with the intent to procure such minor's admission to any motion picture, show, or other presentation, as set forth in subsection (b) of this Code section.

(e) It shall be unlawful for any person knowingly to exhibit, expose, or display in public at newsstands or any other business or commercial establishment or at any other public place frequented by minors or where minors are or may be invited as part of the general public:

(1) Any picture, photograph, drawing, sculpture, motion picture film, or similar visual representation or image of a person or portion of the human body which depicts sexually explicit nudity, sexual conduct, or sadomasochistic abuse and which is harmful to minors; or

(2) Any book, pamphlet, magazine, printed matter however reproduced, or sound recording which contains any matter enumerated in para-(1) of this subsection, or explicit and detailed verbal descriptions or narrative accounts of sexual excitement, sexual conduct, or sadomasochistic abuse and which, taken as a whole, is harmful to minors.

16-12-104. The provisions of Code Section 16-12-103 shall not apply to any public library operated by the state or any of its political subdivisions nor to any library operated as a part of any school, college, or university.