William H. KUCHAREK; Shangri–La Enterprises, Inc., d/b/a Denmark Bookstore; Paradise One, Inc., d/b/a Paradise Video Store; and Gem Books, Inc., d/b/a Pure Pleasure II Bookstore, Plaintiffs,

v.

Donald J. HANAWAY, Attorney General of the State of Wisconsin, Defendant.

No. 88–C–657 (JPS).

United States District Court, E.D. Wisconsin.

June 12, 1989.

Stephen M. Glynn, James A. Walrath, Shellow, Shellow & Glynn, S.C., Milwaukee, Wis., for plaintiffs.

Thomas J. Balistrieri, Asst. Atty. Gen., Wisconsin Dept. of Justice, Madison, Wis., for defendant.

STADTMUELLER, District Judge.

## I. THE PARTIES

Plaintiff William H. Kucharek is employed as a clerk at the Denmark Bookstore. The Denmark Bookstore is owned and operated by plaintiff Shangri–La Enterprises, Inc., which has as part of its stock in trade audio-visual materials, including sexually explicit films and videotapes. Plaintiff Paradise One, Inc. operates the Paradise Video Store, which sells and rents videotapes, some of which are sexually explicit. Plaintiff Gem Books owns and operates Pure Pleasure II Bookstore, having as part of its stock in trade audio-visual materials that include sexually explicit videotapes.

Plaintiffs sue defendant Donald J. Hanaway in his official capacity as attorney general for the state of Wisconsin. By virtue of Wis.Stat. §§ 944.21(7) and 165.-25(3m), he is responsible for determining whether state prosecutions for alleged violations of Wis.Stat. § 944.21 may be commenced.

## II. THE STATUTE

Plaintiffs bring this action to challenge as unconstitutional Wis.Stat. § 944.21, relating to obscenity. Because plaintiffs

**1502**

challenge the statute on several fronts, the provision is printed here in its entirety:

**944.21 Obscene material or performance.** (1) The legislature intends that the authority to prosecute violations of this section shall be used primarily to combat the obscenity industry and shall never be used for harassment or censorship purposes against materials or performances having serious artistic, literary, political, educational or scientific value. The legislature further intends that the enforcement of this section shall be consistent with the first amendment to the U.S. constitution, article I, section 3, of the Wisconsin constitution and the compelling state interest in protecting the free flow of ideas.

(2) In this section:

(a) "Community" means this state.

(b) "Internal revenue code" has the meaning specified in s. 71.01(6).

(c) "Obscene material" means a writing, picture, sound recording or film which:

1. The average person, applying contemporary community standards, would find appeals to the prurient interest if taken as a whole;

2. Under contemporary community standards, describes or shows sexual conduct in a patently offensive way; and

3. Lacks serious literary, artistic, political, educational or scientific value, if taken as a whole.

(d) "Obscene performance" means a live exhibition before an audience which:

1. The average person, applying contemporary community standards, would find appeals to the prurient interest if taken as a whole;

2. Under contemporary community standards, describes or shows sexual conduct in a patently offensive way; and

3. Lacks serious literary, artistic, political, educational or scientific value, if taken as a whole.

(e) "Sexual conduct" means the commission of any of the following: sexual intercourse, sodomy, bestiality, necrophilia, human excretion, masturbation, sadism, masochism, fellatio, cunnilingus or lewd exhibition of human genitals.

(f) "Wholesale transfer or distribution of obscene material" means any transfer for a valuable consideration of obscene material for purposes of resale or commercial distribution; or any distribution of obscene material for commercial exhibition. "Wholesale transfer or distribution of obscene material" does not require transfer of title to the obscene material to the purchaser, distributee or exhibitor.

(3) Whoever does any of the following with knowledge of the character and content of the material or performance and for commercial purposes is subject to the penalties under sub. (5):

(a) Imports, prints, sells, has in his or her possession for sale, publishes, exhibits, or transfers any obscene material.

(b) Produces or performs in any obscene performance.

(c) Requires, as a condition to the purchase of periodicals that a retailer accept obscene material.

(4) Whoever does any of the following with knowledge of the character and content of the material is subject to the penalties under sub. (5):

(a) Transfers or exhibits any obscene material to a person under the age of 18 years.

(b) Has in his or her possession with intent to transfer or exhibit to a person under the age of 18 years any obscene material.

(5)(a) Except as provided under pars. (b) to (e), any person violating sub. (3) or (4) is subject to a Class A forfeiture.

(b) If the person violating sub. (3) or (4) has one prior conviction under this section, the person is guilty of a Class A misdemeanor.

(c) If the person violating sub. (3) or (4) has 2 or more prior convictions under this section, the person is guilty of a Class D felony.

(d) Prior convictions under pars. (b) and (c) apply only to offenses occurring on or after June 17, 1988.

(e) Regardless of the number of prior convictions, if the violation under sub. (3) or (4) is for a wholesale transfer or distribution of obscene material, the person is guilty of a Class D felony.

(5m) A contract printer or employe or agent of a contract printer is not subject to prosecution for a violation of sub. (3) regarding the printing of material that is not subject to the contract printer's editorial review or control.

(6) Each day a violation under sub. (3) or (4) continues constitutes a separate violation under this section.

(7) A district attorney may submit a case for review under s. 165.25(3m). No civil or criminal proceeding under this section may be commenced against any person for a violation of sub. (3) or (4) unless the attorney general determines under s. 165.25(3m) that the proceeding may be commenced.

(8)(a) The legislature finds that the libraries and educational institutions under par. (b) carry out the essential purpose of making available to all citizens a current, balanced collection of books, reference materials, periodicals, sound recordings and audiovisual materials that reflect the cultural diversity and pluralistic nature of American society. The legislature further finds that it is in the interest of the state to protect the financial resources of libraries and educational institutions from being expended in litigation and to permit these resources to be used to the greatest extent possible for fulfilling the essential purpose of libraries and educational institutions.

(b) No person who is an employe, a member of the board of directors or trustee of any of the following is liable to prosecution for violation of this section for acts or omissions while in his or her capacity as an employe, a member of the board of directors or a trustee:

1. A public elementary or secondary school.

2. A private school, as defined in s. 115.001(3r).

3. Any school offering vocational, technical or adult education that:

a. Is a vocational, technical and adult education district school, is a school approved by the educational approval board under s. 38.51 or is a school described in s. 38.51(9)(f), (g) or (h); and

b. Is exempt from taxation under section 501(c)(3) of the internal revenue code.

4. Any institution of higher education that is accredited, as described in s. 39.-30(1)(d), and is exempt from taxation under section 501(c)(3) of the internal revenue code.

5. A library that receives funding from any unit of government.

(9) In determining whether material is obscene under sub. (2)(c) 1 and 3, a judge or jury shall examine individual pictures or passages in the context of the work in which they appear.

(10) The provisions of this section, including the provisions of sub. (8), are severable, as provided in s. 990.001(11).

## III. PLAINTIFFS' ALLEGATIONS

Plaintiffs allege that § 944.21 is violative of the equal protection clause of the fourteenth amendment to the United States Constitution in that it distinguishes between two similarly situated parties without either a compelling reason or a rational basis for such distinction. Specifically, plaintiffs allege: (a) section 944.21(2)(c) criminalizes transactions in allegedly obscene film but not in allegedly obscene videotapes; (b) section 944.21(5m) exempts contract printers from prosecution when they are without editorial review or control over what they print, while at the same time authorizing prosecution of bookstore and video store clerks who are without editorial review or control over what they sell or rent; (c) section 944.21(7) prohibits proceedings under the statute in the absence of a determination by the attorney general that such proceedings may be commenced, while allowing proceedings under identical county ordinances without such a determination and even despite a determination against such a proceeding; and (d) section 944.21(8) exempts from prosecution persons and agencies engaged in the same

activities as plaintiffs while subjecting plaintiffs to prosecution for those activities.

Plaintiffs further allege that Wis.Stat. § 944.21 is violative of the due process clause of the fourteenth amendment to the United States Constitution in that: (a) section 944.21(2)(c)(3) renders unconstitutionally vague the test for obscenity as established in *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); and (b) section 944.21(2)(f) punishes as felonious "wholesale transfers" the delivery of a single item of allegedly obscene material even though at the time of delivery the actor is without knowledge that the delivered material is intended for further delivery to another.

Plaintiffs seek preliminary as well as permanent injunctive relief. They allege that enforcing the statute will prevent plaintiffs from engaging in their lawful businesses and bar public access to the media which plaintiffs would otherwise exhibit and sell. Plaintiffs further allege they face criminal prosecution for their conduct.

## IV. DEFENDANT'S CHALLENGES: RIPENESS, STANDING, ABSTENTION

Plaintiffs invoke this court's jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). They base their causes of action upon 42 U.S.C. § 1983, 28 U.S.C. §§ 2201 and 2202, and the first and fourteenth amendments to the United States Constitution. Defendant does not dispute plaintiffs having met these jurisdictional prerequisites.

Defendant has moved to dismiss this case for lack of jurisdiction, contending first that there is no actual case or controversy. Defendant acknowledges that the existence of a case or controversy is not discernible by precise tests. *See, e.g., Babbitt v. United Farm Worker's National Union,* 442 U.S. 289, 297, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979).

According to defendant, plaintiffs do not suffer from any credible threat of imminent prosecution for violating the Wisconsin obscenity statute. Plaintiffs' allega-tions that the attorney general will enforce the statute are insufficient, according to defendants, because "a litigant must establish a more immediate threat than simply a general policy of enforcing the laws." *J.N.S., Inc. v. Indiana,* 712 F.2d 303, 305 (7th Cir.1983). Defendant also argues that plaintiffs do not claim to be engaging in activity proscribed by the obscenity law, but merely that they sell or rent sexually explicit material. Defendant feels this allegation does not necessarily bring plaintiffs within the ambit of the statute, and that plaintiffs should be required to allege that they expect to violate the law in order to establish an imminent threat of injury.

■ However, the complaint's allegations clearly express plaintiffs' fear that they may be subject to prosecution for selling or renting sexually explicit materials. The parties do not dispute that the attorney general intends to enforce the statute. Plaintiffs' failure to allege explicitly that materials they sell or rent are obscene under the statute is not fatal to the complaint, which challenges the statute's obscenity definition and thereby raises a question of infringing protected speech. The complaint evinces uncertainty as to whether materials sold or rented by plaintiffs are clearly covered by the statute. The parties' uncontested statement of facts indicates that Denmark bookstore has in stock materials that do not fall within the statute's obscenity definition, as well as "more sexually explicit materials."

Plaintiffs also claim they altered their conduct as a result of the statute. Paragraph 17 of the amended complaint alleges that "due to the enactment of section 944.-21 and the uncertainty concerning its scope and application, plaintiff Paradise I, Inc. reduced substantially its stocks of sexually explicit materials to avoid the possibility of prosecution. These inventory reductions caused a corresponding loss of business." Under the requirements of notice pleading, this allegation adequately expresses the claim being made.

Paragraph 16 of the amended complaint states that plaintiffs' fears of possible

prosecution "are based, in part, on the following law enforcement efforts: On June 29, 1988 law enforcement officers in Oshkosh, Wisconsin acting in an undercover capacity, purchased magazine and videotape materials from a clerk at Pure Pleasure II bookstore and referred the matter to the office of the Winnebago County District Attorney for prosecution under the new obscenity statute." Apparently no actual prosecution has yet taken place as a result of these events, but the possibility appears nonetheless real. The attorney general's office has informed the court by letter that defendant has approved prosecutions under the statute. The court is not informed as to whether any proceedings have been formally initiated.

For these reasons, plaintiffs are entitled to challenge the constitutionality of the statute in their own capacities. The facts as alleged firmly ground plaintiffs' standing to claim vagueness, since they demonstrate uncertainty as to statutory coverage, fear of enforcement and real deterrence. *See Entertainment Concepts, Inc. III v. Maciejewski,* 631 F.2d 497, 503 (7th Cir. 1980), *cert. denied,* 450 U.S. 919, 101 S.Ct. 1366, 67 L.Ed.2d 346 (1981). Further, where plaintiffs' "claims are rooted in the first amendment, they are entitled to rely on the impact of the [law] on the expressed activities of others as well as their own." *Shad v. Borough of Mount Ephraim,* 452 U.S. 61, 66, 101 S.Ct. 2176, 2181, 68 L.Ed.2d 671 (1981).

■ Defendant contends that this case raises no first amendment issues, because obscenity is not protected by the first amendment. *Miller v. California,* 413 U.S. 15, 23, 93 S.Ct. 2607, 2614, 37 L.Ed.2d 419 (1973); *Roth v. U.S.,* 354 U.S. 476, 485, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 1498 (1957). The complaint is not optimally direct. However, plaintiffs clearly enough assert that the statute violates the equal protection and due process clauses of the fourteenth amendment, as these provisions apply to rights guaranteed by the first amendment. For example, with respect to the equal protection clause, the complaint refers to statutory discrimination between

allegedly obscene film and allegedly obscene videotapes. More important, the complaint alleges that the statute violates the due process clause of the fourteenth amendment by rendering unconstitutionally vague the test for obscenity as established in *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). Finally, the complaint alleges that enforcing the statute will prevent plaintiffs "from engaging in their lawful businesses of selling media and concomitantly prevent [ ] the general public from access to a media which plaintiffs would otherwise exhibit and sell." In sum, plaintiffs' allegations clearly raise an initial question of whether the alleged vagueness of the statute's obscenity test results in regulating protected materials. While more direct expression might be ideal, these allegations, within the context of the complaint as a whole, are reasonable notice that plaintiffs believe the challenged statute infringes protected first amendment rights.

Defendant next argues that plaintiffs lack standing to challenge certain provisions of the obscenity statute because plaintiffs' own rights are not adversely affected by those provisions. Defendant correctly points out that the jurisdiction of the federal courts is limited, and that the federal courts are duty bound to avoid adjudication of constitutional issues when not necessary to determine parties' rights in a particular case. *See County Court v. Allen,* 442 U.S. 140, 154, 99 S.Ct. 2213, 2223, 60 L.Ed.2d 777 (1979). Therefore, defendant's objections to this court taking jurisdiction over particular challenges made by plaintiffs are worthy of individual attention.

■ First, plaintiffs claim that subsection 7 of the statute violates the fourteenth amendment's equal protection clause because it requires that the attorney general approve proceedings under the statute but not proceedings under identical county ordinances. However, plaintiffs "are prepared to concede that their challenge to subsection (7) ... may be premature since they are not aware that any county has adopted § 944.21 by ordinance." Plain-

tiffs' Memorandum in Opposition to Defendant's Motion to Dismiss or Abstain at 11 (footnote). This concession compels me to dismiss plaintiffs' specific challenge to subsection 7 in the absence of a genuine case or controversy.

Plaintiffs challenge subsection (8) of the statute because it subjects them to prosecution for certain activities while exempting some entities engaged in the same activities. Plaintiffs are commercial enterprises, while the exempt institutions are seemingly noncommercial. The obscenity statute is aimed at commercial activity. Wis.Stat. § 944.21(3) (1988). Defendant contends that plaintiffs lack standing to attack the exemption for noncommercial institutions because they are not similarly situated, and because they are not demonstrably injured by the provision's operation.

■ Nonetheless, § 944.21(8)(a) explicitly frees libraries and educational institutions to engage in commercial dissemination of obscenity without fear of prosecution under that provision. This clear exemption from prosecution gives rise to a legitimate equal protection claim by retailers of sexually explicit material. *See Upper Midwest Booksellers v. City of Minneapolis,* 602 F.Supp. 1361, 1375 (D.Minn.), *aff'd.* 780 F.2d 1389 (8th Cir.1985); *Pollitt v. Connick,* 596 F.Supp. 261, 265 (E.D.La. 1984).

■ Plaintiffs assert that subsection (2)(f) is unconstitutionally vague in violation of the fourteenth amendment's due process clause because retailers, such as plaintiffs, could be charged under that provision with the wholesale transfer of materials, a felony, even though they did not intend that recipients of the material resell, exhibit or redistribute it commercially. Defendant disputes plaintiffs' standing to challenge this provision because plaintiffs do not "allege that they make any wholesale transfers, either with or without knowledge that the purpose of the transfer is commercial distribution of the material." Therefore, defendant asserts plaintiffs are not affected by the provision. Plaintiffs, in turn, correctly contend that their uncertainty about the subsection's scope and their

legitimate fear that it will be enforced against them provide standing. *Entertainment Concepts, Inc. III v. Maciejewski,* 631 F.2d 497, 503 (7th Cir.1980).

Defendant next asks this court to abstain from entertaining this action until the state courts have had an opportunity to construe the statute, reasoning that certain provisions can be authoritatively interpreted in a way which would avoid the need to reach federal constitutional questions. *See Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

Abstention doctrine is firmly established, *Waldron v. McAtee,* 723 F.2d 1348, 1351 (7th Cir.1983). Though courts should abstain where appropriate, abstention remains a narrow exception to a federal court's duty to adjudicate controversies properly before it. *See, e.g., Colorado River Water Conservation District, et al. v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). Abstention can be justified "only in the exceptional circumstances where [it] ... would clearly serve an important countervailing interest." *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188–189, 79 S.Ct. 1060, 1062–1063, 3 L.Ed.2d 1163 (1959); *See Bickham v. Lashof,* 620 F.2d 1238, 1245 (7th Cir.1980) (and sources cited therein). As a rule, abstention is particularly disfavored where statutes are challenged on their face as abridging free expression. *See City of Houston, Texas v. Hill,* 482 U.S. 451, 467, 107 S.Ct. 2502, 2512, 96 L.Ed. 2d 398 (1987).

This court's discretion to abstain is quite limited. In *City Investing Co. v. Simcox,* 633 F.2d 56, 60 (7th Cir.1980), the Seventh Circuit clearly summarized the well established guidelines concerning abstention:

"The paradigm of the 'special circumstances' that makes abstention appropriate is a case where the challenged state statute is susceptible of a construction by the state judiciary that would avoid or modify the necessity of reaching a federal constitutional question." *Kusper v. Pontikes,* 414 U.S. 51, 54 [94 S.Ct. 303, 306, 38 L.Ed.2d 260]. [citations omitted]

But when the state statute at issue is "fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question," [*Harman v. Forsennius*, 380 U.S. 528, 535 [85 S.Ct. 1177, 1182, 14 L.Ed.2d 50] (1965)] abstention may be required "in order to avoid unnecessary friction in federal-state relations, interference with important state functions, tentative decisions on questions of state law, and premature constitutional adjudication," *Id.*, at 534 [85 S.Ct. at 1181].

Though the court is bound to abstain where appropriate, it remains true that "[t]he abstention doctrine is not an automatic rule applied wherever a federal court is faced with a doubtful issue of state law; it rather involves a discretionary exercise of a court's equity powers." *Baggett v. Bullitt*, 377 U.S. 360, 375, 84 S.Ct. 1316, 1324, 12 L.Ed.2d 377 (1964). The court must determine on a case by case basis whether there exist the "special circumstances" prerequisite to applying abstention doctrine. *Id.* (citations omitted).

■ I now consider the particular provisions defendant advances as appropriate subjects for saving construction by state courts. First, plaintiffs allege that the Wisconsin statute denies equal protection because it applies to films but not to videotapes. Defendant believes that, while the statute does not explicitly refer to videotapes, it can fairly be construed to apply to them.

Where a challenged statutory provision is open to an indefinite number of interpretations, a single authoritative construction may be insufficient since "extensive adjudications, under the impact of a variety of factual situations" will likely be needed to bring the provision within constitutional limits. *Baggett*, 377 U.S. at 378, 84 S.Ct. at 1325 (1963). In such circumstances abstention may actually work to fragment and prolong constitutional adjudication rather than avoid it, a result that may inhibit exercise of first amendment freedoms. *Id.* at 378–79, 84 S.Ct. at 1325–26.

On the other hand, a typical case appropriate for abstention is " 'that of a state statute, not yet construed by the state courts, which is susceptible of one construction that would render it free from federal constitutional objection and another that would not.' " *Waldron v. McAtee*, 723 F.2d at 1352 (quoting Friendly, *Federal Jurisdiction: A General View*, 93 (1973)). Defendant argues that this case fits that pattern, since the statute either applies to videotapes, eliminating plaintiffs' objection, or it does not; creating an unreasonable classification denying equal protection. Given these alternatives, defendant argues, Wisconsin courts are obliged to choose the construction making a statute valid rather than invalid. Of course, federal court interpretation of state statutes is not binding in state courts. *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 11, 107 S.Ct. 1519, 1526, 95 L.Ed.2d 1 (1987). But in this case, either alternative results in constitutional adjudication. Should the court find the statute does not apply to videotapes the court must decide whether it denies equal protection, though defendant concedes the statute's invalidity under those circumstances. In the event the statute applies to videotapes, plaintiffs claim it violates the due process clause. In effect, construing "film" strongly implicates, if it does not amount to, constitutional adjudication. Should this court abstain, it retains jurisdiction over plaintiffs' federal constitutional claims. *See Pullman*, 312 U.S. 496, 61 S.Ct. at 643. If a state court then finds the statute does apply to videotapes, plaintiffs may return to this court.

Abstention is not justified under these circumstances. Evading decision on this matter by leaving it to the state courts will not avoid or modify the necessity of reaching a federal constitutional question, nor will it substantially modify the federal constitutional question involved. Neither party indicates a state law or unique state constitutional provision that may decide the case. "[W]here it has seemed unlikely that resolution of the state law question would significantly affect the federal claim [citations omitted], the Court has held that abstention shall not be required.", *Harris County Commissioners Court v. Moore,*

420 U.S. 77, 84, 95 S.Ct. 870, 875, 43 L.Ed. 2d 32 (1975), *See Kusper v. Pontikes,* 414 U.S. at 55, 94 S.Ct. at 306 (Abstention inappropriate when underlying state statute is not susceptible of interpretation that might avoid need for constitutional adjudication.) Defendants' argument clearly indicates that the alternative interpretations available implicate only federal constitutional questions.

The possibility that abstention must result either in a constitutional finding or further constitutional litigation makes abstention impracticable, particularly in light of plaintiffs' request for a preliminary injunction and the possibility that protracted litigation will increase any economic threat posed by statute enforcement. In all fairness, this court is obliged to recognize that this litigation is already approaching its first anniversary. Abstention will cause further delay without avoiding constitutional adjudication. While various factors militate against abstention, this court is fully capable of adjudicating this dispute according to the statutory construction guidelines applied by Wisconsin courts.

The plaintiffs also allege that the statute denies due process because it provides additional punishment for "wholesale" transfers of obscene material even though the person making the transfer does not know that the material is to be resold or commercially distributed. Defendant believes the statute can reasonably be construed to require such knowledge.

Again, abstention on this issue is not justified. Finding a requirement of knowledge or intent would only lead to further constitutional inquiry. Again defendant concedes that if the statute lacks a knowledge requirement it is unconstitutional. On this issue, too, the court is fully capable of considering and fulfilling any judicial obligation to choose the construction of a statute that avoids doubt about its constitutionality. The court can apply constitutional, as well as state statutory, rules for expressing the knowledge requirement.

Plaintiffs also allege the statute is unconstitutionally vague because it defines material as obscene if it lacks, among other things, serious "educational" value. Defendant recognizes that interpreting "educational" does not simply involve choosing among a limited number of definite alternatives. But he argues that this constitutional claim can be avoided or modified by an explanatory construction of the statute. According to defendant, abstention is appropriate because Wisconsin courts could construe "educational value" in a manner that would at least " 'materially change the nature of the problem' " before the court. *City Investing Co.,* 633 F.2d at 64 (citations omitted).

Defendant also argues that the chief objection to *Pullman* abstention, that it wastes time, carries less weight because only by chance have plaintiffs been genuinely threatened with prosecution but not yet arrested. *See Waldron v. McAtee,* 723 F.2d at 1353. But this argument does not outweigh a federal court's clear duty to avoid abstaining from adjudicating cases properly before it except in special circumstances. Having been allowed the right to bring this action, plaintiffs are not to be denied their chosen forum simply because they have had the dubious misfortune not to be prosecuted. That plaintiffs might choose to fully litigate all their constitutional claims in state court in the event this court abstains, *England v. Louisiana State Board of Medical Examiners,* 375 U.S. 411, 418, 84 S.Ct. 461, 466, 11 L.Ed.2d 440 (1964), does not determine this court's proper role.

Because defendant apparently recognizes that "educational value" could bear a number of meanings, this court could reasonably hold that abstention is inappropriate on the simple ground that "[i]t is fictional to believe that anything less than extensive adjudications, under the impact of a variety of factual situations, would bring the [term] within the bounds of permissible constitutional certainty." *Baggett,* 377 U.S. at 378, 84 S.Ct. at 1326.

In fact, it appears that no construction of the term "educational value" will substantially change the nature of the constitutional question before the court. No matter what definition the construing court

adopts, it faces the underlying question of deciding whether the term is sufficiently clear on its face to meet constitutional standards. At the very least, this dispute involves deciding whether the term is unconstitutionally vague as used in the statute. For these reasons, abstention is inappropriate.

## V. PRELIMINARY INJUNCTION MOTION

When seeking a preliminary injunction, the movant bears the burden of establishing the five requirements necessary for the issuance of the injunction:

1. That it has no adequate remedy at law;

2. That it will suffer irreparable harm if the preliminary injunction is not issued;

3. That the irreparable harm it will suffer if the preliminary injunction is not granted outweighs the irreparable harm the defendant will suffer if the injunction is granted;

4. That it has a reasonable likelihood of prevailing on the merits; and

5. That the injunction will not harm the public interest.

*Curtis v. Thompson,* 840 F.2d 1291, 1296 (7th Cir.1988); *Baja Contractors, Inc. v. City of Chicago,* 830 F.2d 667, 675 (7th Cir.1987) (citing *Manbourne, Inc. v. Conrad,* 796 F.2d 884, 887 (7th Cir.1986)), *cert. denied* —— U.S. ——, 108 S.Ct. 1301, 99 L.Ed.2d 511 (1988).

■ To the extent plaintiffs' claims are rooted in the first amendment, I note that any imminent infringement of first amendment interests constitutes irreparable injury satisfying the requirement for preliminary injunctive relief. "The loss of first amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed. 2d 547 (1976) (Brennan, J., concurring) (citing *New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). Though the threat of irreparable harm is substantially diminished if plaintiffs fail to demonstrate that first amendment freedoms are actually implicated by

the statute, a legitimate dispute about whether the statute threatens protected expression cannot be ignored.

Similarly, the court takes note of the economic consequences at issue. Mere monetary damages, as a rule, do not constitute irreparable injury. But if the statute is unconstitutional, prosecution and the threat of prosecution may result in lost sales that can be difficult or impossible to quantify. That plaintiffs' vagueness challenges allow them to raise the rights of others compounds this effect. In considering the statute's constitutionality, the court must realistically consider its impact. Whether or not plaintiffs have an adequate remedy at law or will suffer irreparable harm is difficult to consider without assessing the merits of the dispute.

The balance of harms, if anything, weighs in favor of plaintiffs. The state's obscenity statute lay dormant for several years prior to modification, after the Wisconsin Supreme Court struck it down, suggesting that some delay in enforcing the statute will not significantly harm the state. As for the fifth factor, the state's interests must be equated with determining whether or not the statute is constitutional. The remaining question is whether movant has a reasonable likelihood of prevailing on the merits. Whether or not preliminary injunctive relief should be granted largely turns on this question. To make this assessment, I will consider plaintiffs' statutory challenges seriatim.

■ I begin with plaintiffs' assertion that Wisconsin's statute renders unconstitutionally vague the test for obscenity set forth in *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419. Obscenity is one of the few categories of speech subject to permissible government regulation because it is unprotected by the first amendment. *See, e.g., Miller v. California,* 413 U.S. at 20–23, 93 S.Ct. at 2613–2614 (1973). If the state's test sweeps beyond regulation of obscenity and suppresses constitutionally protected speech, the statute is likely to fall.

Under the statute, material is obscene if, among other things, it "[l]acks serious literary, artistic, political, educational or scientific value, if taken as a whole." Wis. Stat. § 944.21(2)(c)(3). One of the guidelines set forth by the *Miller* Court for determining something to be obscene is "whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Miller*, 413 U.S. at 24, 93 S.Ct. at 2614–2615. The Wisconsin statute modifies this standard only by inserting the word "educational." Plaintiffs maintain that inserting "educational" renders the obscenity test vague.

The Wisconsin declaratory judgment law requires a court to "receive the testimony of experts and evidence as to the literary, cultural or educational character" of material alleged to be obscene. Wis.Stat. § 806.05(4). According to plaintiffs, this concept of "literary, cultural, or educational character" is very different from the obscenity statute's formula. But as to these three terms, the declaratory judgment formula is indistinguishable on its face from the obscenity statute's test. Plaintiffs fail to show any conflict between the provisions.

Long before deciding *Miller*, the Supreme Court explicitly recognized that individuals' perceptions of what constitutes literary, artistic or educational value will inevitably vary widely. *Hannegan v. Esquire, Inc.*, 327 U.S. 146, 157, 66 S.Ct. 456, 461–462, 90 L.Ed. 586 (1946). Plaintiffs themselves acknowledge a number of cases concluding that the term "educational" in the context of an obscenity statute is not unconstitutionally vague. *See, e.g., Piepenburg v. Cutler*, 649 F.2d 783, 786–87 (10th Cir.1981); *U.T., Inc. v. Brown*, 457 F.Supp. 163, 166 (W.D.N.C.1978); *State v. Next Door Cinema*, 225 Kan. 112, 587 P.2d 326 (1978). " 'It cannot be logically argued that [the words "scientific," "educational," "governmental"] are vague when such words as "literary", "artistic" and "political" all pass constitutional muster' " under *Miller*. *Piepenburg*, 649 F.2d at 786 (quoting *State v. Haig*, 578 P.2d 837 (Utah 1978)). "[A]ll the due process clause requires is that the law give sufficient warning that men may conduct themselves so as to avoid that which is forbidden." *Rose v. Locke*, 423 U.S. 48, 50, 96 S.Ct. 243, 244, 46 L.Ed.2d 185 (1975).

Adding "educational" to the list of terms provided in *Miller* merely narrows the unprotected body of obscene speech subject to prosecution. I must conclude for purposes of this motion that "educational", as used in the Wisconsin statute, is not unconstitutionally vague. Like the other terms set forth in *Miller*, "educational" can be applied objectively under a reasonable person standard. *Cf. Pope v. Illinois*, 481 U.S. 497, 501 n. 3, 107 S.Ct. 1918, 1921 n. 3, 95 L.Ed.2d 439 (1987) (reasonable person standard used to apply *Miller* test).

Plaintiffs also contend the statute violates the fourteenth amendment's equal protection clause by excluding videotapes from the definition of materials subject to prosecution. If plaintiffs are correct, defendant concedes, the statute fails. Construing the statute must precede considering plaintiffs' equal protection arguments.

Before turning to the terms of the disputed provision, I note several accepted principles guiding statutory instruction. First, "it is well settled that courts are obligated to interpret a statute in a manner which avoids potential constitutional infirmities." *Northwest Hospital, Inc. v. Hospital Service Corp.*, 687 F.2d 985, 992 (7th Cir.1982) (citations omitted). Accordingly, in *State ex rel Lynch v. Conta*, 71 Wis.2d 662, 689, 239 N.W.2d 313 (1976), the Wisconsin Supreme Court stated: "Given a choice of possible interpretations, this court must select the construction that results in constitutionality rather than invalidity [citation omitted], just as we will choose a reasonable construction rather than one that leads to unreasonable or absurd results."

Because the courts uphold constitutionality where reasonable while avoiding unnecessary absurdity, rules of statutory construction do not bind the court to a literal statutory reading where literalism would thwart the legislative intent underlying the statute. *See Kealey Pharmacy and Home Care Service, Inc. v. Walgreen Co.*, 539

F.Supp. 1357, 1364–65 (W.D.Wis.), *aff'd* 761 F.2d 345 (7th Cir.1982); *Harnischfeger Corp. v. U.S. Environmental Protection Agency,* 515 F.Supp. 1310, 1315 (E.D.Wis. 1981). "A statute must be construed ... in light of its manifest object, the evil to be remedied." *State v. Clausen,* 105 Wis.2d 231, 239, 313 N.W.2d 819 (1982); *State v. Morse,* 126 Wis.2d 1, 4, 374 N.W.2d 388 (Ct.App.1985), *petition for review denied,* 127 Wis.2d 572, 383 N.W.2d 64 (1986).

A statute or a portion of a statute is ambiguous if it is capable of being understood by a reasonably well informed person in more than one way. *State ex rel Newspapers, Inc. v. Showers,* 135 Wis.2d 77, 87, 398 N.W.2d 154 (1987). If statutory language is ambiguous, the court examines the scope, history, context, subject matter and object of statute to discern legislative intent. *State v. Pham,* 137 Wis.2d 31, 34, 403 N.W.2d 35 (1987).

In the absence of a statutory definition, a word ordinarily must be given its plain meaning. *State v. Morse,* 126 Wis.2d at 4, 374 N.W.2d 388 (1985) (citing *State v. Wittrock,* 119 Wis.2d 664, 670, 350 N.W.2d 647 (1984)). "Nontechnical words in statutes are given their ordinary and accepted meaning when not specifically defined, and that definition may be ascertained from a recognized dictionary." *Id.*

▮ Under § 944.21(2)(c), " 'obscene material' means a writing, picture, sound recording or film which" meets certain criteria. Plaintiffs contend that this provision does not include videotapes within its scope.

Plainly enough, a videotape is not a "writing." Likewise, a videotape is not a "sound recording," though it may record sound.

A videotape, plaintiffs persuasively argue, can not be a "picture." Reasonably enough, plaintiffs define a "picture" as "an image visible to the naked eye, such as a drawing, painting or photograph." Plaintiffs' Brief in Support of Motion for Preliminary Injunction, at 8. To the naked eye, a videotape is merely a magnetic tape. Plaintiffs point out that a videotape produces a visual image only when properly combined with sophisticated electronic equipment. "Picture", plaintiffs argue, must be given its "normal meaning [of] ... an individual static image." A broader interpretation of that term to include a series of moving pictures would render the legislature's use of the term "film" redundant, a conclusion to be avoided. *See, e.g., Matter of Clark,* 738 F.2d 869, 872 (7th Cir. 1984).

According to plaintiffs, "[a] film is a type of motion picture." Plaintiffs' Brief in Support of Motion for Preliminary Injunction, at 9. I must agree this definition is reasonable, expressing the term's "plain meaning." But film has a number of distinct definitions. Its primary definition is "a thin layer or coating;" or "a thin sheet of any material." *Random House Dictionary of the English Language* 718 (2d ed. unabridged 1983). It also holds the following meanings with respect to photography and motion pictures.

In the context of photography, "film" means:

(a) a cellulose nitrate or cellulose acetate composition made in thin sheets or strips and coated with a sensitive emulsion for taking photographs;

(b) a strip or roll of the foregoing;

(c) the coating or emulsion on such a sheet or strip.

In the motion picture context "film" means:

(a) a strip of transparent material, usually cellulose triacetate, covered with a photographic emulsion and perforated along one or both edges, intended for the recording and reproduction of images;

(b) a similar perforated strip covered with an iron oxide emulsion, intended for the recording and reproduction of both images and sound;

(c) motion picture.

*Id.*

Neither party contends that "film" as used in the statute refers to the unprocessed material on which motion pictures are recorded. Rather, both parties reasonably equate "film" with "motion picture." Plaintiff merely contends that "film" only

refers to one type of motion picture. Strictly speaking, "motion picture" itself may refer to a particular means of producing nonstill pictures. *Id.* at 1254. But its more colloquial synonym, "movie" commonly refers to the finished production; and the parties reasonably accept "motion picture" as referring to continuous pictures in which depicted images move or appear to move.

The above dictionary definition of "film" suggests that it commonly refers to the finished production, regardless of how it is made. "Film" is treated as synonymous with "motion picture." Likewise, "video" is often used as a synonym for "motion picture" or "movie." "Video" commonly means "a program, movie or the like that is available commercially on videocassette." *Id.* at 2120. More succinctly, "videotape" may be a "length of videotape or the recording it carries." *Oxford English Dictionary* 615 (2d ed. 1989). Likewise "film" may be a strip of specially treated transparent material or the recording it carries. Both film and videotape record moving pictures. In the brief history of video technology, the distinction between magnetic tape and photographic film has frequently been blurred. Hence, "video film" originally referred to "a cinematographic film of a television broadcast; [but] now [it means] a recording on video cassette." *Id.* at 614. Film is not a "type" of motion picture or movie, but a synonym for "movie," just as one commonly accepted definition of "videotape" is "movie." In the statute's context, that of viewing a movie production, the terms are commonly applied synonymously. In the common parlance, to rent a film is to rent a motion picture (a point the parties agree on) is to rent a movie is to rent a video.

Plaintiffs purport to distinguish "film" from "videotape" on several technical grounds. But these distinctions serve also to illuminate general similarities. A photographic film is created through a process producing images on a sensitized surface by the action of radiant energy, especially light. A videotape is produced by electronically recording signals on a sensitized surface. Photographic film is chemically processed to make images visible. Special equipment is then used to project the image on a screen. Without such technology, a photographic moving picture may become a series of still pictures (regulated as such in the statute). A special machine is used to read videotape signals and transmit them through a television set where they are decoded and appear as images. These facts all serve to blur whatever technical distinction the average consumer might draw between video and film. It seems unlikely that the common viewer has more than a passing understanding of the technology involved in either process. A movie is a movie.

Other states appear to have avoided such problems in coverage when enacting their obscenity statutes. For example, the Illinois statute simply refers to "any obscene writing, picture, record or other representation or embodiment of the obscene." Ill. Ann.Stat. ch. 38, para. 11–20 (Smith–Hurd West Supp.1988–89). Often statutes are designed to be all inclusive while cataloging as many specific examples as possible. For example, under the Michigan statute, "material" subject to prosecution means:

[A]nything tangible which is capable of being used or adapted to arouse prurient interest, whether through the medium of reading, observation, sound, or in any other manner, including but not limited to, anything printed or written, any book, magazine, newspaper, pamphlet, picture, drawing, pictorial representation, motion picture, photograph, video tape, video disk, film, transparency, slide, or any other medium used to electronically produce or reproduce images on a screen, or any mechanical, chemical, or electronic reproduction. Material includes undeveloped photographs, molds, printing plates, and other latent representational objects notwithstanding that processing or other acts may be required to make its content apparent.

Mich.Comp.Law.Ann. § 752.362(4) (West Supp.1988–89). Such statutes demonstrate a clear legislative tendency to be as inclusive as possible, but offer little assistance

in construing the Wisconsin statute's terms.

Courts applying these terms commonly use "film" and "video" interchangeably, or use "film" in reference to "video cassette film." *See, e.g., New York v. P.J. Video, Inc.,* 475 U.S. 868, 106 S.Ct. 1610, 89 L.Ed. 2d 871 (1986); *State v. Watson,* 231 Neb. 507, 437 N.W.2d 142, 144 (1989); *Floyd v. Video Barn, Inc.,* 538 So.2d 1322 (Fla.App. 1 Dist.1989); *State v. Velez,* 17 Conn.App. 186, 551 A.2d 421, 425 (1988) *cert. denied,* 210 Conn. 810, 556 A.2d 610 (1989); *Studio Art Theatre v. State,* 530 N.E.2d 750 (Ind. App. 1 Dist.1988). Likewise, courts in other contexts generally equate "film" with "videotape." In *People v. Heading,* 39 Mich.App. 126, 197 N.W.2d 325, 329 (1972), ruling on the foundation needed to introduce a videotape into evidence, the court noted that "[a] videotape is nothing more than a motion picture synchronized with a sound recording." *See also State v. Johnson,* 18 N.C.App. 606, 197 S.E.2d 592, 594 (1973) (following *Heading,* 197 N.W.2d at 329). Similarly, *Turner Communications Corp. v. Chilivis,* 239 Ga. 91, 236 S.E.2d 251, 253 (1977) held that the term "motion picture film" in a Georgia tax statute included "videotape," noting: "[i]t is uncontradicted that videotape is merely an advanced state of the art of motion picture film."

In *County of Kenosha v. John H. Liggett and Brian R. D'Angelo,* No: 86–OR–597; 86–OR–598 (Circuit Court of Kenosha County, Sept. 17, 1986), the court struck down a county ordinance containing phrasing identical to that considered here. The ordinance defined "obscene material", in part, to mean "a writing, picture, sound recording or film...." The court noted:

The ordinance was enacted in January of 1986. Certainly, the word "videotape" was commonly used by the general public at the time of the enactment. The ordinance is not ambiguous. It does not attempt by its own language to be all encompassing of every form of depiction. It limits by its own definition what may be considered "obscene material."

*Id.* at 2. I am obliged to give a careful, reasonable reading of the statutory text, upholding the statute if it is fairly susceptible to a constitutional reading.

This court is also aware that the Wisconsin legislature has enacted other statutory provisions that distinguish film and videotape recording. Such a distinction exists in Wis.Stat. § 948.05, entitled "Sexual Exploitation of a Child", enacted in the same legislative session as the statute before the court. The significance of the disparity between these statutes, related by subject matter and enacted by the same legislature, does not escape the court. *See, e.g., Erlenbaugh v. United States,* 409 U.S. 239, 244, 93 S.Ct. 477, 480, 34 L.Ed.2d 446 (1972), *In re Wisconsin Mutual Insurance Co.,* 241 Wis. 394, 412, 6 N.W.2d 330 (1942), *cert. denied, Hinze v. Duel,* 319 U.S. 747, 63 S.Ct. 1157, 87 L.Ed. 1703 (1943).

Likewise, the court understands that, during the legislative session in which the present statute was enacted, an alternative senate bill was proposed to govern the same subject matter. The senate bill, though it would have made a distinction between film and videotape, was not passed (S. 7, Wis., Nov. 1987 Spec.Sess.). Clearly the state legislature had the intellectual tools to achieve greater drafting precision. This court has no power to punish mere legislative carelessness, inconsistency, or even laziness, but must consider the validity of the law as passed.

The Legislative Reference Bureau's analysis of assembly bill 10, which became the present law, indicates that the materials encompassed are those covered under the preceding law. It also indicates that the new legislation is a response to *State v. Princess Cinema of Milwaukee, Inc.,* 96 Wis.2d 646, 292 N.W.2d 807 (1980), which expressly declined to redraft the state's obscenity law to conform to prevailing constitutional standards but left that task to the legislature. That the legislature may have endeavored to do so (seven years later and at the governor's request) by making only minimal changes is not implausible. Nor is this possibility illuminating. Legis-

lative history before the court offers little assistance.

The court does draw guidance from the statute's scope and context. In § 944.21(1), the legislature expresses its intent that the statute be used "primarily to combat the obscenity industry." The constant growth of videotape use in society is nearly self evident. Evidence of video technology's importance to the obscenity industry, if not logically obvious to the legislature, was certainly readily accessible through studies of both the video industry and pornography in the United States. *See* Statement of Uncontested Facts at 7–8. Assuming, *arguendo*, it remained valid, the statute could still be used to combat the obscenity industry if it did not apply to videotapes. But the result would be absurd, farcical at best. It would leave law enforcement officers like a weaponless David before a presumed Goliath. Plaintiffs' argument suggests the legislature capitulated to the monstrous video industry. Though the court is not blind to the realities of the political process, this mere suggestion does not evince legislative intent.

The court, of course, must interpret the statute "in light of its manifest object and the evil to be remedied," as well as to avoid unreasonable or absurd results. *Morse*, 126 Wis.2d at 4, 374 N.W.2d 388 (citations omitted). In *Morse*, the court considered a statutory prohibition against touching a minor's "vagina." The court concluded that

[t]o define vagina according to its medical definition would permit a defendant to touch almost the entire female external genetalia without legal consequence. Such a construction is contrary to the legislature's intent [to broaden certain protections]. Moreover, it is absurd to construe vagina so narrowly as to permit touching of the external female genitalia.

*State v. Morse*, 126 Wis.2d at 5, 374 N.W. 2d 388. *Morse* is perhaps not directly on point, but its reasoning applies. "Film" as used in § 944.21 is clearly synonymous with "motion picture" or "movie": strictly defining it to exclude "videotape," which also commonly is treated as synonymous with "movie" or "motion picture," is absurd in the context of an anti-obscenity statute broadly aimed at commercial transactions in obscene materials. Such a result is also contrary to the available indications of legislative intent.

My conclusion is affirmed by due process considerations. Plaintiffs argue that if the statute applies to videotapes, it is void for vagueness because it fails to provide adequate notice of this application. But common sense tells one, assuming all possible technical distinctions, that if he might be prosecuted for selling or leasing an obscene photographic film, he is equally likely to be prosecuted for selling or leasing an obscene videotape. This reasoning eliminates concerns for ambiguity. The touchstone for measuring vagueness is whether a scrutinized law meets the due process clause requirement of providing sufficient warning against proscribed conduct. *Rose v. Locke*, 423 U.S. 48, 96 S.Ct. 243, 46 L.Ed.2d 185 (1975). I must conclude this requirement is met.

Plaintiffs contend for the first time in a footnote that § 944.21(2)(e) is vague in that it fails to indicate whether the statute prohibits material that describes or shows "simulated" forms of sexual conduct. Under § 944.21(2), obscene material is defined as that which "describes or shows sexual conduct in a patently offensive way." And " 'sexual conduct' means the commission of any of [certain specified acts]."

The statute's prohibitions must be assessed in light of the guideline consideration set out in *Miller*, 413 U.S. at 24, 93 S.Ct. at 2614–2615; "whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law." The Court's examples of what states could define for regulation under the foregoing guideline include: "[p]atently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated." *Id.* at 25, 93 S.Ct. at 2615. Clearly the Court accepted "represent" as the common definition of "depict."

The statute does not explicitly extend its prohibition to showing or describing "sim-

ulated" conduct. Use of the word "commission" suggests that "simulated" conduct is not prohibited, since to commit an act is to actually carry it out. This reasoning is supported by the use of the word "show" rather than "represent." The primary definition of "show" is "to cause or allow to be seen, exhibit, display," or "to present." *Random House Dictionary of the English Language* 1772 (2d ed. unabridged).

To "simulate" is to imitate or "make a pretense of." *Id.* at 1783. In the *Miller* context, it is to give an appearance of actual behavior, or to depict in a realistic manner. To "represent" may be even more abstract, encompassing symbolic as well as simulated depiction. To "represent" is "to serve to express, designate, stand for, or denote, as a word, symbol or the like does; symbolize." *Id.* at 1634.

To "depict" is "to represent by or as if by painting; portray; delineate" or to "describe." *Id.* at 534. These terms encompass a broad range of forms through which to convey meaning, from abstract to actual. In contrast, "show" suggests presentation of actual behavior.

Wisconsin's statute does use "describe", the other operative term in the *Miller* guideline. The primary meaning of "describe," the meaning evidently intended in *Miller,* is "to tell or depict in written or spoken words; give an account of." *Id.* at 538. Another definition sometimes given is "to transmit a lifelike image of." *Webster's II New Riverside University Dictionary* at 366 (1984). Defendant also offers the following definition: "to represent by words, models or pictures." Brief in Opposition to Motion for Preliminary Injunction at 23 (citing *Webster's Ninth New Collegiate Dictionary* at 343). Even this definition reflects the word's core meaning of giving an exacting image.

In interpreting the statute I am guided by these dictionary definitions as well as common sense. I am also guided by the awareness that this statute's vagueness, for constitutional purposes, must be assessed in terms of whether the scrutinized provision gives fair warning of the pro-scribed conduct. *See, e.g., Rose v. Locke,* 423 U.S. at 49, 96 S.Ct. at 244.

The statute defines sexual conduct as the commission of certain specified acts. It is not unreasonable to say that these acts can be shown without actually engaging in them. Simulated activity may fairly show the prescribed conduct. The statute reasonably can be construed to apply to performances or materials that describe the commission of the specified acts. Certainly the difference between verbal descriptions of actual and simulated sexual conduct would be difficult or impossible to discern. Similarly, the statute can reasonably apply to material showing what appears to be commission of the specified acts. This provision will never stand as a benchmark of clarity. But no reasonable person reading the statute would think it lawful to show vividly realistic simulated commission of sexual acts, while unlawful to show the actual commission of the same sexual acts.

To say that the statute's prohibitions may extend to depiction of simulated sexual conduct raises the more complicated issue of exactly what form of representations are prohibited by the statute. For example, the statute might clearly apply to a photograph of persons engaging in, or simulating, the specified sexual conduct. But whether it applies to such forms of presentation as animation, cartoons or figurines is not clear.

A number of alternatives face the court. One possibility is to accept defendants' broad definition of "describe." Given its broadest possible implications, the term could be applied to all manner of representations. Cartoon characters, after all, can conceivably commit the specified acts within the imaginative context in which they exist.

Support for this reading may be drawn from the nature of the obscenity test itself. To be obscene, material must be something the "average person, applying contemporary community standards, would find appeals to the prurient interest if taken as a whole." Wis.Stat. § 944.21(2)(c)(1). Further, "[i]n determining whether material is obscene ... a judge or jury shall examine

individual pictures or passages in the context of the work in which they appear." Wis.Stat. § 944.21(9). Ultimately, the test is a contextual assessment based on the fact finder's perceptions. The statute specifies certain conduct, and the trier of fact must determine the propriety of how that conduct is presented, or in other words, whether the conduct is described or shown in a "patently offensive way." Practically speaking, the trier of fact actually decides whether a presentation describes or shows the commission of an act.

A key problem with this view is that it virtually eliminates any clear meaning of "described" or "commission," allowing these terms' meanings to vary with their context. This wide latitude effectively allows the trier of fact to determine the nature of conduct that may not be presented, since prurient appeal may depend on the form of presentation. This approach fails to explain the Wisconsin legislature's departure from the *Miller* guideline.

However, an opposite interpretation is equally plausible. That is, particularly since the statute uses terms that depart from the operative terms of the *Miller* test, the statute should perhaps be read to cover only what is definitely included. Applying the clearest or primary definitions of the statute's terms leads to the conclusion that the prohibition extends only to showing or verbally describing the actual commission of acts. The legislature, in fact, may have drafted the statute in the belief that being sexually aroused by cartoons, or even simulated behavior, is aberrant. The statute may deliberately avoid aiming at material using such forms of depiction.

Because the statute reasonably bears a range of meanings, I must consider it in light of *Miller*. *Miller* stressed the need for careful drafting, with the Court announcing:

> No one will be subject to prosecution for the sale or exposure of obscene materials unless these materials depict or describe patently offensive "hard core" sexual conduct specifically defined by the regulating state law, as written or construed. We are satisfied that these specific pre-

requisites will provide fair notice to a dealer in such materials that his public and commercial activities may bring prosecution.

*Miller,* 413 U.S. at 27, 93 S.Ct. at 2616. This statement also emphasizes the importance of practical due process considerations in assessing a statute's adequacy.

The Wisconsin statute defines sexual conduct in terms of specific acts. Whether certain presentations of conduct are included in this definition may depend on the form of presentation. This court must give due regard to the statute's departure from the *Miller* terms.

In *State v. Princess Cinema of Milwaukee*, 96 Wis.2d 646, 292 N.W.2d 807 (1980), the court considered Wisconsin's obscenity statute as judically construed, striking it down as overbroad under *Miller*. The court declared that "[a]s a matter of policy, we decline to further act to rectify the differences in this statute. The problems of public policy and the regulation of commercial conduct are for the legislature. With the advent of *Miller v. California,* the outlines for specific legislation have crystalized. But the Court in *Miller* intended merely to propose guidelines, not enter regulatory schemes for the states." *Id.* at 661, 292 N.W.2d 807 (citing *Miller,* 413 U.S. at 25, 93 S.Ct. at 2615).

The *Princess* court further concluded that Wisconsin's "statute has been subjected to this court's perception that the legislature and the people want an obscenity statute with these standards imposed. We feel that it is no longer our function to make this judgment." *Id.* 96 Wis.2d at 662, 292 N.W.2d 807. Finding that legislative silence in this area did not evince approval of the court's judgment or saving construction, the court returned to the legislature the task of drafting penal legislation. The legislature's eventual response was the law now challenged in this court.

■ Having been explicitly directed to *Miller* for guidance, the legislature chose to depart from the *Miller* phrasing. This variation's import is simply not clear. *Miller* implicitly distinguished between two forms of representation: description and

depiction. Likewise, the legislature may have distinguished between forms of depiction, finding only realistic reproduction of the actual commission of certain acts to be obscene. Or the legislature may have drafted carelessly, without giving careful definition to its terms. Unlike the dispute concerning the definition of "film," this issue presents more than one reasonable resolution. The parties have raised a reasonable doubt about what manner of portrayal is covered by § 944.21(2)(c) and (d). Resolving this doubt is the legislature's responsibility, not an appropriate judicial task. On the record before this court, the statute appears unconstitutionally vague, as it fails to meet the due process requirement of providing fair notice of what is prohibited. *See Miller*, 413 U.S. at 27, 93 S.Ct. at 2616; *Rose*, 423 U.S. at 49, 96 S.Ct. at 244; *Princess*, 96 Wis.2d at 659–60, 292 N.W.2d 807.

■ Having reached this conclusion, I will nonetheless consider plaintiffs' other claims to assure a complete record. The parties disagree about what standard applies to plaintiffs' equal protection claims. Because the challenged classifications do not interfere with the exercise of a fundamental right or disadvantage a suspect class, these classifications must meet the requirements of the rational relation test, rather than strict scrutiny. *See, e.g., Vaden v. Village of Maywood*, 809 F.2d 361, 365 (7th Cir.), *cert. denied*, 482 U.S. 908, 107 S.Ct. 2489, 96 L.Ed.2d 381 (1987). If the statute regulated protected expression, strict scrutiny and the accompanying requirement of a compelling state interest would be appropriate.

Contrary to plaintiffs' suggestion, difficulty in distinguishing between obscene and protected material in many instances does not mandate application of strict scrutiny. Defendant correctly points out that the classifications challenged on equal protection grounds do not play a role in defining obscenity.

Plaintiffs rely heavily on three cases involving statutes governing materials deemed harmful to minors. *American Booksellers Association, Inc. v. Webb*, 643 F.Supp. 1546 (N.D.Ga.1986); *Upper Midwest Booksellers v. City of Minneapolis*, 602 F.Supp. 1361 (D.Minn.), *aff'd* 780 F.2d 1389 (8th Cir.1985); *Tattered Cover, Inc. v. Tooley*, 696 P.2d 780 (Colo.1985). But strict scrutiny is appropriate in such cases because what is obscene for children is not necessarily obscene for adults, as two of the three courts explicitly emphasized. *American Booksellers*, 643 F.Supp. at 1548, 1555 n. 19; *Tattered Cover*, 696 P.2d at 784–85.

Under the rational basis test, statutory classifications will be set aside "only if based on reasons totally unrelated to the pursuit of [a legitimate state end]. Legislatures are presumed to have acted constitutionally and their statutory classifications will be set aside only if no grounds can be conceived to justify them." *McDonald v. Board of Election*, 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739 (1969) (citations omitted). This test affords the legislature discretion to move "one step at a time, addressing itself to the phase of the problem which seems most accute to the legislative mind." *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955). *See Clements v. Fashing*, 457 U.S. 957, 963, 102 S.Ct. 2836, 2843, 73 L.Ed.2d 508 (1982); *Schilb v. Kuebel*, 404 U.S. 357, 364–65, 92 S.Ct. 479, 484–85, 30 L.Ed.2d 502 (1971) (collecting cases).

Plaintiffs' challenge Wis.Stat. § 944.21(8)(a), exempting schools, libraries, and other institutions and their employees from prosecution under this statute, as violative of the fourteenth amendment's equal protection clause. Because the statute is aimed at commercial activities, this exemption effectively makes the statute inapplicable to commercial distribution of obscene materials by certain institutions.

Defendant argues that the school and library exemption is rationally related to the legitimate state interest in protecting institutions of learning having a public purpose from harassment by persons attempting to use the obscenity statute to censor works with legitimate literary, artistic, political, scientific or educational value. The

legislature explicitly states in the statute that it wishes to preserve financial resources for use in fulfilling the "essential purposes of libraries and educational institutions."

As defendant points out, the legislature could reasonably conclude that it did not want the obscenity statute used as a tool to harass schools and public libraries into removing protected materials under fear of prosecution. Defendant concedes that such prosecution is unlikely to succeed, but argues that institutions might succumb to mere threats of prosecution to avoid the adverse publicity and expenditure of scarce resources any litigation would require. Further, defendant points out, groups might pressure institutions into ending commercial as well as noncommercial dissemination of protected material such groups found objectionable. Or, groups might simply allege that activity was commercial because school or library employees were paid a salary for their work.

 The statute as a whole clearly serves a legitimate state purpose in aiming to curtail commercialized obscenity, *See Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973), but the exemption does not serve this purpose. This court will not question the legislature's motivations for creating the exemption. Preserving scarce resources and protecting institutions from undue harassment may well be reasonable legislative concerns. The legislature might also conclude that public institutions do not ordinarily engage in commercial dissemination of material; or that these institutions comprise a negligible portion of the obscenity industry. Whatever purposes the exemption serves, the distinction it makes is unrelated to the statute's purpose except, perhaps, by way of contradiction. The exemption does not distinguish on the basis of defining and curtailing commercial dissemination of obscenity. Rather, it allows certain public institutions to engage in the very transactions otherwise punishable under the statute.

In response to defendant's claim that the exemption promotes the free flow of ideas in society, plaintiffs rightly point to the importance of many commercial establishments in this promotional role. This role itself does not shield dissemination of unprotected material. The court need not consider whether commercial establishments play a role differing in degree or kind from that of the specified exempt institutions when disseminating obscene material. Because the exemption's terms contravene the statutory purpose, the exemption is simply not a reasonable tool for promoting the free flow of ideas in society. The statute indulges in invidious discrimination. The legislature remains free to meet legitimate concerns through thoughtful drafting.

Several other courts have considered comparable classifications. In *State v. Luck,* 353 So.2d 225, 232 (La.1977), the court found that the state had no legitimate interest in allowing a college or other public institution to disseminate obscenity for commercial gain while prosecuting a neighboring commercial establishment for the same activity. *Cf. Pollitt v. Connick,* 596 F.Supp. 261, 264–65 (E.D.La.1984) (following *State v. Luck,* 353 So.2d at 232).

In *U.T., Inc. v. Brown,* 457 F.Supp. 163, 165 (W.D.N.C.1978), the court considered an exception for "bona fide scientific, medical, educational, governmental or judicial" uses of obscenity. The court found that this exception was not vague, since it required an inquiry similar to that of the *Miller* obscenity test. *See also 400 E. Baltimore Street, Inc. v. State,* 49 Md.App. 147, 431 A.2d 682 (1981) (upholding similar exemption), *cert. denied,* 455 U.S. 940, 102 S.Ct. 1431, 71 L.Ed.2d 650 (1982). However, the *Brown* court did strike down the exemption because it applied only to certified, but not noncertified professionals. The court concluded: "Because the exception ... depends not simply on noncommercial purpose and use but also on the profession or occupation of the person involved in the use or dissemination, the ordinance is *pro tanto* inconsistent with the Equal Protection Clause." *Brown,* 457 F.Supp. at 166.

*Commonwealth v. Ferro*, 372 Mass. 379, 361 N.E.2d 1234, 1236 (1977), considered an exemption for any "bona fide school, museum or ... [anyone] acting in the course of his employment as an employee of such organization or of a retail outlet affiliated with and serving the educational purpose of such organization." In finding that the exception may have a rational basis, the court reasoned: "This [exemption] may reflect a policy of protecting educational resources from use in obscenity litigation rather than social service while still proceeding to eliminate public availability of obscene matter. The legislature may proceed one step at a time." *Id.* 361 N.E.2d at 1237. The court implicitly viewed the exemption as making a distinction between commercial and noncommercial disseminators. *Id.*

Considering a similar exemption in a statute prohibiting dissemination of pornography generally, the court in *4000 Asher, Inc. v. State*, 290 Ark. 8, 716 S.W.2d 190, 193 (1986), noted the possible justification of "protecting educational resources." But the court found stronger justification for upholding the classification in its restriction to persons acting within the scope of their regular employment. According to the Arkansas court, the legislature could reasonably believe there is no real possibility the exempt employees would disseminate obscene material in the course of their regular employment. "Presumably the exemption was inserted as a precaution against the possibility that someone might check a book out of a public library and contend that the librarian was disseminating obscene matter." *Id.* 716 S.W.2d at 193; *cf. Long v. 130 Market St. Gift and Novelty, Etc.*, 294 Pa.Super. 383, 440 A.2d 517, 527–28 (1982) (upholding similar exception).

Nonetheless, the exemption specifically allows institutions to engage in activities otherwise prohibited. If the exemption is designed to protect commercial dissemination of obscenity by specific parties, it irrationally undermines the statutory scheme: the statute designates commercial dissemination of obscenity as the crime. The exemption does not distinguish on the basis

of noncommercial activity. And if the exemption merely protects against harassment and preserves resources, this goal may be achieved through careful drafting. If the exempt institutions do not traffic in obscenity, the exception serves no legitimate cause. Empowering institutions to commercially disseminate obscenity, in order to preclude anyone from accusing them of engaging in that activity, is incongruous.

Plaintiffs also attack as denying equal protection the statute's exemption of contract printers who lack authority to edit the materials submitted to them. Because this exemption extends to contract printers' employees and agents, plaintiffs argue that this provision would exempt a warehouse or storage facility which serves as a collection, storage and distribution point of obscene materials, so long as there is an "agency" relationship with the contract printer for those obscene materials and the printer has no editing power over the materials. Such an agency relationship to the contract printer, argue plaintiffs, would protect the agent-distributor despite the latter's direct involvement in distribution of the material in violation of § 944.21(3)(a). However, the statute makes it sufficiently clear that the exemption applies only to agency in the contract printing process. It does not appear that a contract printer's agent would be exempt if he or she acted as an agent in fulfilling some other role than that of contract printer.

The statute does not define contract printer. However, it appears that contract printers typically accept material which has been written, edited, type-set and laid out by others, and merely reproduce it on their photo-offset printing machinery. *Maynard v. Port Publications, Inc.*, 98 Wis.2d 555, 556–57, 567–68, 297 N.W.2d 500 (1980). Due to the nature of this process, contract printers have negligible contact with the actual content of materials they are reproducing. *Id.* 297 N.W.2d at 568. The Wisconsin Supreme Court has described contract printers as providing "a quick and inexpensive printing service that by its low cost allows access to the print media by

groups that would otherwise not find such access." *Id.* at 567.

The parties have identified no other state obscenity statute exempting printers from prosecution, and this court's research has revealed none. However, a number of states have exempted theater employees, variously including ushers, ticket takers and projectionists. There is some split of authority among state courts on the validity of these exemptions.

In *State v. Baker*, 11 Kan.App.2d 4, 711 P.2d 759, 763 (1985), considering a claim that an exemption for projectionists denied equal protection to bookstore clerks, the court reviewed the case law and summarized reasons most commonly given by courts for upholding such distinctions. First, the court noted that one viewing a motion picture has no means to further disseminate the film beyond the theater, while printed material may be redistributed without limit once it leaves the store. Other bases for distinction commonly cited are:

> (1) the potential chilling effect the prosecution of projectionists may have on the showing of constitutionally protected films; (2) the fact that bookstore clerks may influence the customer's choice as to a wide range of materials, while a projectionist must show whatever film has been selected by management; and (3) projectionists, by the nature of their work, have less of an opportunity to determine whether a film is obscene than does a bookstore clerk in determining whether a magazine is obscene.

*State v. Baker*, 711 P.2d at 763 (and sources cited therein).

The decription of a contract printer set forth in *Maynard* suggests the applicability of these justifications. If contract printers are presumably ignorant, by and large, of the content of material they print, their conscious choice to participate in disseminating obscenity is no more evident than that of theater employees. The contract printer exemption only applies to "the printing of material that is not subject to the contract printers' editorial review or control."

The parties' statement of uncontested facts in the present case sets out the following pertinent circumstances:

1. Plaintiff Kucharek does not have authority or discretion to edit or alter the materials available for sale, rental, or viewing at the bookstore premises.
2. Plaintiff Kucharek does not have authority to establish policy or guidelines as to what types of materials will be offered for sale, rental or viewing at the bookstore premises.
3. Plaintiff Kucharek does not have any involvement in the actual production, printing, or assembly of any of the materials which are offered for sale, rental or viewing at the bookstore premises.

No evidence suggests that Kucharek is atypical among persons in his profession in the above respects.

Prosecuting contract printers, and thereby raising the specter of printer as censor, has no more chilling implication than prosecuting bookstore clerks. Absent an exemption, the same judgment about whether material is obscene or protected must be made by a producer or disseminator of material. That clerks have more direct contact with consumers or greater opportunity to determine that material is obscene are also specious distinctions. Both clerk and printer merely facilitate transfer of obscene material from producer to consumer. The printer makes it possible for the clerk to present materials to consumers.

Plaintiffs correctly point out that the statute allows the exemption even when the contract printer operates with the full knowledge of the materials' content. Whatever the printer's knowledge of the material he produces, it is difficult to distinguish a contract printer from a store clerk selling obscene materials. They may have identical knowledge of the material they deal in, and identical lack of control over this materials' content; whether because their employment status gives them no editorial power or because they have contracted away any such power. Both may be mere links in the distribution chain.

■ This exemption is not based on the kind of material or the function of persons

classified: contract printers may produce or distribute material that others may not. Nor is the exemption based on the nature of the transactions: commercial publishing, printing and transferring obscene material are all otherwise prohibited. The statute aims at commercial dissemination of obscenity. The contract printer exemption, quite at odds with the statutory scheme, sets forth a class that may profit from commercial dissemination of obscenity: this distinction is irrational. Defendant argues that the printing exemption covers only a small segment of the obscenity industry. Assuming this position is correct, the statute nonetheless does not exempt transactions in printed materials. The contract printer exemption protects a certain class of commercial obscenity disseminators, while subjecting others to prosecution for transacting in the same materials. This exemption, too, must fall.

■ Plaintiffs argue that the statute denies due process under the fourteenth amendment because it imposes felony penalties for the "wholesale transfer of obscene material without proof of any specific intent that the materials be redistributed. "Wholesale transfer or distribution of obscene material" is defined in § 944.21(2)(f) as "any transfer for a valuable consideration of obscene material for purposes of resale or commercial distribution; or any distribution of obscene material for commercial exhibition." Plaintiffs concede that § 944.21(5)(e) suggests that a felony conviction for "wholesale" transfer cannot occur in the absence of proof that the defendant acted with knowledge of the character and content of the material involved. However, plaintiffs contend the statute lacks a scienter requirement that would obligate the state to prove the defendant's specific intent or knowledge that the materials be commercially redistributed. To impose liability, an obscenity law must require a scienter element. *New York v. Ferber*, 458 U.S. 747, 765, 102 S.Ct. 3348, 3358–3359, 73 L.Ed.2d 1113 (1982). Without such a scienter requirement, the statute is unconstitutionally vague.

In particular, plaintiffs argue that the statute fails to meet the requirements of Wis.Stat. § 939.23. This section expressly provides that "when criminal intent is an element of a crime in chapters 939 to 951, such intent is indicated by the term 'intentionally', the phrase 'with intent to,' the phrase 'with intent that,' or some form of the verbs 'know' or 'believe'." The Wisconsin Supreme Court shed light on this provision in *State v. Alfonsi*, 33 Wis.2d 469, 147 N.W.2d 550, (1967), considering whether changes made in a challenged statute resulted in the elimination of a scienter requirement. The court concluded that "framers of the new enactment did not have in mind the elimination of scienter but, on the contrary, preserved the 'concept of corruption' by requiring that the various acts be done 'with an understanding.' In our view, the latter phrase brings § 946.10(2), stats., within the scope of § 939.23 regarding the assertion of criminal intent in the statute." *Id.* at 476, 147 N.W.2d 550. When *State v. Alfonsi* was decided, Wis.Stat. 939.23(1) was in all pertinent respects identical to the current provision, quoted above.

■ Section 939.23(4) provides: " 'With intent to' or 'with intent that' means that the actor either has a purpose to do the thing or cause the result specified, or is aware that his or her conduct is practically certain to cause that result." Though the statute presently under scrutiny does not strictly comply with § 939.23(1), it applies the latter provision's definition of these acceptable phrases rather than the phrases themselves. The intent requirement is clear, providing a definite enforcement standard. In short, a fair reading of the text demonstrates that plaintiffs are unlikely to prevail in challenging Wis.Stat. § 944.21(2)(f).

■ Finally, Wis.Stat. § 944.21(10) is a severability clause stating that the "provisions of this section, including provisions of subsection (8), are severable as provided in § 990.001(11)." Though plaintiffs are otherwise likely to prevail on their challenge to the exemptions in subsection (8) as well as the contract printer exemption in subsec-

tion (5m), severability is not a pressing issue where the entire statute fails. For the sake of completeness I note that invalid portions of a statute are to be severed unless it is evident the legislature would not have enacted the valid provisions without those that are invalid. *INS v. Chadha*, 462 U.S. 919, 932, 103 S.Ct. 2764, 2774, 77 L.Ed.2d 317 (1983). A severability clause expresses legislative intent on this issue. *Id.* A provision is also presumed severable if the remainder of the statute is "fully operative as law" without the severed portion, *Id.* at 934, 103 S.Ct. at 2775 (citations omitted), as would be true in this case if only subsections (5m) and (8) were stricken.

## ORDER

Accordingly,

IT IS ORDERED that defendant's motion to dismiss or abstain be and the same is hereby DENIED; and

IT IS FURTHER ORDERED that plaintiffs' motion for a preliminary injunction be and the same is hereby GRANTED; and

IT IS FURTHER ORDERED that if the defendants do not appeal this decision, and the court does not receive within sixty (60) days from the date of this order a request in writing from either party for a trial on the merits, the preliminary injunction issued today shall become permanent, and judgment will be entered in plaintiffs' favor and against defendant without further notice from the court.

Dated at Milwaukee, Wisconsin this 12th day of June, 1989.